PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.

No. 98-2592

MARYLAND AMBULANCE SERVICES,
INCORPORATED,
Respondent.

On Application for Enforcement of an Order
of the National Labor Relations Board.
(5-CA-27611)

Argued: May 6, 1999

Decided: September 23, 1999

Before MURNAGHAN, WILLIAMS, and MICHAEL,
Circuit Judges.

_____

Enforcement granted by published opinion. Judge Murnaghan wrote
the opinion, in which Judge Williams and Judge Michael joined.

_____

COUNSEL

ARGUED: J. Michael McGuire, SHAWE & ROSENTHAL, Balti-
more, Maryland, for Petitioner. Richard A. Cohen, Senior Attorney,
NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for
Respondent. ON BRIEF: R. Michael Smith, SHAWE & ROSEN-
THAL, Baltimore, Maryland, for Petitioner. Frederick L. Feinstein,
General Counsel, Linda Sher, Associate General Counsel, John D.

Burgoyne, Acting Deputy Associate General Counsel, NATIONAL
LABOR RELATIONS BOARD, Washington, D.C., for Respondent.

_____

**OPINION**

MURNAGHAN, Circuit Judge:

The National Labor Relations Board ("Board") found that the
Maryland Ambulance Service, Inc. ("MAS" or"Company") violated
Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act
("NLRA"), 29 U.S.C.A. §§ 158(a)(1),(5), by refusing to bargain with
Drivers, Chauffeurs, and Helpers Local Union No. 639 ("Union").
After an election and the Board's review of objections to the election,
the Board certified the Union as the exclusive bargaining representa-
tive of an appropriate unit of the Company's employees. The Com-
pany refused to bargain, arguing that the Board erred in refusing to
recognize the votes of three employees and in overruling the Compa-
ny's objections regarding alleged misconduct by Union supporters.
The Board now seeks enforcement of its Order. Because we find no
abuse of discretion with respect to the Board's decision regarding the
challenged votes and other election objections, we grant enforcement
of the Order requiring MAS to recognize and bargain with the Union.

I.

The Maryland Ambulance Service operates its business from a
facility located in Columbia, Maryland. On June 5, 1997, the Union
filed a representation petition with the Board, seeking certification as
the exclusive collective-bargaining representative of a unit consisting
of employees at that facility. On June 20, the parties entered into a
stipulated election agreement ("Stipulation" or "Stipulation Agree-
ment"), specifying which job classifications would compose the bar-
gaining unit**1** and designating the date, time, and place for a Board

_____

**1** Under the Stipulation, the unit included "[a]ll full-time and regular
part-time paramedics, EMT drivers, EMT attendants, nurses, field super-
visors, maintenance leader, make ready officers, detailer, call intakers,
dispatch supervisors, public relations officers, special project assistant
and administrative assistants employed by the employer at its Columbia,
Maryland location . . . ."

2

election. The Stipulation also limited voting eligibility to those employees "employed during the payroll period[ending June 8] . . . including employees who did not work during that period because they were ill, on vacation, or temporarily laid off, employees engaged in an economic strike which commenced less than 12 months before the election date and who retained their status as such during the eligibility period and their replacements, and employees in the military services of the United States who appear in person at the polls."

The Board conducted a secret-ballot election at the Company's facility on July 23 and 24, 1997. The tally of the ballots indicated that forty-three employees voted in favor of union representation, while thirty-eight employees cast their votes against representation. Ten ballots were challenged, some by the Union and others by the Company. In addition, each party filed timely objections to the election, charging the other with having engaged in conduct that interfered with employees' free choice. The Union alleged that MAS (1) omitted names from the list of employees eligible to vote; (2) unlawfully promised employees a chance to win $350 worth of gasoline for viewing an anti-union film and polled those employees who watched the film; (3) unlawfully coerced and polled employees by running a raffle for a television during the hours the polls were open; and (4) conferred an unlawful benefit by providing each eligible employee a free ticket for the television raffle. On the other hand, MAS alleged that the Union, through its agents and MAS employees, (1) improperly granted benefits to employees during the days immediately preceding the election and on election day by providing free meals and alcoholic beverages; (2) intimidated and coerced employees with direct threats, by destroying company property, and by damaging employees' personal property; and (3) improperly offered to reduce or waive initiation fees for those individuals that signed union authorization cards and publicly demonstrated their support for the Union.

On August 6, 1997, the Regional Director issued a report, in which he directed that a hearing be held to resolve the issues raised by the challenged ballots and the parties' election objections. Following the hearing, the Hearing Officer issued a report in which he recommended that both parties' election objections be overruled, that the challenges to five ballots be sustained, and that the challenges to the remaining five ballots be overruled. The Hearing Officer directed that

the ballots subject to the overruled challenges be opened and counted. The Company filed timely exceptions to the report, arguing that the Hearing Officer erred in sustaining the Union's challenges to three ballots and in recommending that four of the Company's election objections be overruled.

On January 16, 1998, the Board issued a decision in which it adopted the Hearing Officer's findings and recommendations. The Board's Regional Director opened and counted the ballots and issued a revised tally indicating that the Union had won the election by a count of forty-four to forty-two votes. Based upon the revised tally, the Regional Director certified the Union as the exclusive bargaining representative.

Despite the Union's certification, the Company has refused the Union's request to bargain. The Union filed an unfair labor practice charge against MAS, which prompted the Regional Director to issue a complaint alleging that MAS's refusal to bargain violated Sections 8(a)(1) and 8(a)(5) of the NLRA.[2] 29 U.S.C.A. §§ 158(a)(1), (5). The Company filed an answer to the complaint, admitting its refusal to bargain and contesting the validity of the certification of the Union on the same grounds argued before the Board in the representation proceeding.

The Board's General Counsel filed a motion for summary judgment, which the Board granted. The Board found that all the issues raised by the Company in the unfair labor practice proceeding were, or could have been, litigated in the underlying representation proceeding. Since the Company had not offered any newly discovered or previously unavailable evidence that would warrant a reexamination of the Union's certification, the Board found that the Company's refusal to bargain with the Union violated Sections 8(a)(1) and 8(a)(5). The

_____

**2** Section 8(a)(1) provides that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of th[e] title." 29 U.S.C.A. § 158(a)(1). Section 8(a)(5) makes it unlawful for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of th[e] title." 29 U.S.C.A. § 158(a)(5).

Board ordered the Company to cease and desist from interfering with, restraining, or coercing employees in the exercise of their statutory rights. The Board further required the Company, upon request, to bargain with the Union and, if an understanding is reached, to embody the understanding in a signed agreement. The Board now seeks enforcement of its Order.

II.

"Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." NLRB v. A.J. Tower Co., 329 U.S. 324, 330 (1946); see also NLRB v. Waterman Steamship Corp., 309 U.S. 206, 226 (1940) ("The control of the election proceedings, and the determination of the steps necessary to conduct [an] election fairly were matters which Congress entrusted to the Board alone."). With this congressional objective in mind, this Court has found the results of a Board-supervised representation election to be presumptively valid. See NLRB v. VSA, Inc., 24 F.3d 588, 592 (4th Cir.), cert. denied, 513 U.S. 1041 (1994). "[I]f the Board's certification decision is reasonable and based on substantial evidence in the record as a whole," id., and is consistent with the NLRA, we are obliged to affirm the decision. See Glenmark Associates, Inc. v. NLRB, 147 F.3d 333, 338 (4th Cir. 1998); see also 29 U.S.C.A. § 160(e) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."). We will overturn a representation election only where the Board has clearly abused its discretion. See VSA, Inc., 24 F.3d at 592.

After the election, the Union challenged the votes of three employees, Charles Lookingbill, Brian Nicoli and Erica Smith, on the ground that they were not "employed" by MAS on June 8, 1997, the eligibility cut-off date set by the parties' Stipulation Agreement. The Board sustained the Union's challenges, which MAS maintains was erroneous.

The Board has long required that, in order to be eligible to vote in a representation election, an employee "must be both `hired and working' on the eligibility date." NLRB v. Family Heritage Home-Beaver

5

Dam, Inc., 491 F.2d 347, 349 (7th Cir. 1974); see also NLRB v. Dalton Sheet Metal Co., Inc., 472 F.2d 257, 258 (5th Cir. 1973) (noting that it is well-settled that "an individual must be employed and working on the established eligibility date in order to be eligible to vote" in a union election). There must be an "`actual performance of bargaining unit work'" during the specified period, not merely "`participation in training, orientation or other preliminaries.'" NLRB v. Tom Wood Datsun, Inc., 767 F.2d 350, 352 (7th Cir. 1985). The Board's "actual work" rule is one of administrative convenience and serves three primary functions: (1) it prevents the employer from manipulating the election process by hiring employees favorable to its position just prior to the election, see id.; (2) it ensures that the employee is exposed to the arguments for or against unionization, see NLRB v. Magnesium Casting Co., Inc., 668 F.2d 13, 19 (1st Cir. 1981); Dalton Sheet Metal Co., 472 F.2d at 260 (noting that the rule "make[s] the identity of eligible voters quickly and easily ascertainable"); and (3) it is a "simple and fair" rule to "determin[e] whether newly hired employees are part of the bargaining unit," Tom Wood Datsun, 767 F.2d at 352; see also Family Heritage Home, 491 F.2d at 349 (noting that the rule "simplif[ies] the process of identifying eligible voters . . . [since] objective evidence is usually available to pinpoint the time at which an employee commences work while the date of `hire' is often subject to dispute"). Based on the foregoing, the Board's rule is clearly a reasonable one. Barring waiver,**3** it is appropriate for the Board to apply the rule in an effort to effectuate the meaning of the term "employed" in an election agreement.

While it is undisputed that none of the employees at issue here performed any unit work prior to the cut-off period, MAS insists that the employees were, in fact, "employed." Before June 8, 1997, the Company had interviewed, tested, and offered jobs to each of the employees in question; received their acceptances of the offers; entered their names into the payroll system database; issued MAS identification cards and uniform items to them, as well as required the employees to purchase other uniform items; paid for their medical examinations and compensated them for time spent taking those examinations; and

_____

**3** The "actual work" rule may be waived by the parties in a written and signed agreement. See Trilco City Lumber Co., Inc., 226 NLRB 289 (1976).

6

scheduled job training. MAS argues that such preliminary activities make the three employees in question eligible voters.

MAS further contends that since none of the reasons in support of the "actual work" rule is relevant to the instant case, the rule should not be applied. First, MAS claims that it hired the three employees before it knew of the Union's organizing campaign, so it was not attempting to manipulate the election. Second, MAS points out that it placed the names of the employees on the list of eligible voters provided to the Union, so the Union was able to campaign for their votes. Since the Board's objectives in applying the rule are not jeopardized in the present case, MAS urges, the rule's application is unnecessary and arbitrary.

The Company presents compelling arguments, but we find them unavailing in the situation before us. While bright-line rules, like the one advanced by the Board here, may run the risk of being over- or under-inclusive in their coverage, it is generally recognized that the certainty and stability such a rule affords outweighs any harm done when the rule is applied evenly. Here, the "actual work" rule facilitates the determination of voting eligibility and avoids disputes to the extent possible. The benefits of uniform application of the rule, therefore, transcend any ill effects that may result from coverage of non-working employees to whom the rule's rationale may not be directly relevant.

The Company complains, however, that the Board has not, in fact, applied the rule evenly, since it has previously included individuals as "employees" even though they had not actually performed any bargaining unit work. See Riviera Manor Nursing Home, Inc., 200 NLRB 333, 1972 WL 5129 (NLRB), enforced in part , 487 F.2d 1405 (7th Cir. 1973). In Riviera Manor Nursing Home , for example, the Board allowed the union to count the signed authorization cards of three employees who had been hired, but had not yet begun working at the time they signed the cards, as proof of its majority status for a bargaining order. 1972 WL 5129, at *2. The issuance of a bargaining order pursuant to a determination of a union's majority status requires the employer to recognize and bargain with the union without an election. The Company argues that the Board's willingness to allow a union to request recognition based on authorization cards

7

signed by non-working employees undermines its rigid adherence to the "actual work" rule in the election context.

We are amenable to the Company's argument but believe that it operates in favor of an expanded, not curtailed, application of the "actual work" rule. The determination of a union's majority status "serves as a rough substitute for a union election -- a sort of second-best mechanism for assessing the extent of union support among a company's employees." Magnesium Casting Co. , 668 F.2d at 19. As such, it makes sense that we apply eligibility deadlines to the majority status determination, as we do in the election context. The practical purposes that the "actual work" rule serves in a representation election, e.g., ensuring that employees have been exposed to arguments for and against unionization, are as essential in a determination of majority status. We, therefore, find that requiring a hired employee to perform bargaining unit work in order to be included in a count to determine majority status is a reasonable and sensible extension of the Board's "actual work" rule. See id. (applying the "actual work" rule to a majority status determination). We do not here, however, purport to require such an extension. Recognizing that the Board retains broad discretion to establish and direct election procedures, we reserve that decision for another day.

In addition, MAS asserts that the "actual work" rule is inconsistent with the express terms of the Stipulation agreed upon by both MAS and the Union. The Stipulation provides:

> The eligible voters shall be unit employees employed during the payroll period for eligibility, including employees who did not work during that period because they were ill, on vacation, or temporarily laid off, employees engaged in an economic strike which commenced less than 12 months before the election date and who retained their status as such during the eligibility period and their replacements, and employees in the military services of the United States who appear in person at the polls.

MAS maintains that the Stipulation provision makes the date an employee was hired, not the date bargaining unit work was first performed, the relevant date for determining voting eligibility. The plain

8

language of the Stipulation suggests otherwise, however. As the Board explains, the provision specifies that voters must be unit employees "employed" during the payroll period for eligibility. It further states that those "employed" include individuals who failed to perform work during the eligibility period for one of the reasons set out in the Stipulation. The provision's specification of limited grounds for considering a non-working employee to be"employed" only buttresses the general rule that employees who are not working during the eligibility period are otherwise ineligible. See Barry Controls, Inc., 113 NLRB 26, 27 (1955) (concluding that "in order to vote, an individual must be employed and working on the established eligibility date, unless that individual was absent for one of the reasons set out in the . . . election agreement"); General Chemical Works, 67 NLRB 174, 175 (1946) (finding that the only non-working employees who could be exempt from the requirement that eligible voters be employed and working on the established eligibility date were those unit employees who were not working for reasons specified in the Direction of Elections).

Finally, MAS argues that the Board did not put it on sufficient notice regarding the meaning given to the term "employed." MAS contends that the Board deprived it of due process by using a criterion for voting eligibility that was not clearly disclosed in the Stipulation. First, as explained above, the Stipulation does suggest that non-working employees, with the exception of those delineated, are ineligible to vote. Second, in so much as the "actual work" rule is long-settled Board policy, see, e.g., J. Halpern Co., 108 NLRB 1142, 1143 (1954) ("The Board's well-established election rules require that, in order to be eligible to vote, an individual must be employed and working on the established eligibility date, unless that individual was absent for one of the reasons specified in the direction of election."), MAS was duly informed of the operable meaning of the term "employed."

In agreement with the other circuits that have considered this question, we find that the Board's rule excluding from voting eligibility employees who have not actually worked is reasonable and well within the Board's broad rule-making discretion regarding election eligibility. We, therefore, affirm the Board's decision with respect to the three challenged ballots.

9

III.

MAS also seeks to invalidate the election based on its allegations that Union supporters intimidated unit employees with threats and the destruction and misuse of MAS property. During the weeks before the election, for example, MAS experienced an increase in the number of ambulances that had to be removed from service due to vehicle malfunctions and unexplained damage. Although MAS has conceded that the misconduct could not be linked to specific individuals, it alleges that Union supporters were responsible. In addition, MAS maintains that Union supporters harassed anti-union employees and that one Union advocate angrily confronted MAS personnel to create a fictitious problem with management in order to attract Union support. Given the circumstances, MAS insists that the Board should have set aside the results of the election.

"[W]hen assessing the probable impact of particular incidents on election results, conduct which is not attributable to either the employer or the union is accorded less weight." NLRB v. Hydrotherm, Inc., 824 F.2d 332, 337 (4th Cir. 1987). In cases involving third-party or anonymous acts of misconduct, election results will be set aside "only where the conduct is `so aggravated that a free expression of choice of representation is impossible.'" Id. ; see also VSA, Inc., 24 F.3d at 595 (noting that "`the Board will not set aside an election unless an atmosphere of fear and coercion rendered free choice impossible'"). The objecting party must "`show by specific evidence not only that unlawful acts occurred but also that such acts sufficiently inhibited the free choice of employees as to affect materially the results of the election.'" Hydrotherm, 824 F.2d at 334. No such showing has been made in the present case. None of the acts of vandalism was perpetrated against a voter.[4]  None of the acts was accompanied by threats or acts of violence directed against anyone.[5]

_____

[4] In any event, we have recognized that a minor incident of property damage, even if directed at an employee, is not enough to overturn an election. See Hydrotherm, 824 F.2d at 337.
[5] To support its conclusion that the misconduct had a coercive impact, MAS has relied on testimony that was discredited by the Hearing Officer. One unit employee, Mark Buckholtz, apparently refused to place a

10

Furthermore, no evidence establishes that the Union or its agents were responsible for the acts. The facts simply do not support a conclusion that a "free expression of choice of representation [was] impossible." Id. at 337.

Moreover, the Company's allegations of harassment of anti-Union employees by Union supporters, even if true, do not aver conduct sufficiently coercive as to set aside the election results. There is no evidence that the alleged misconduct -- i.e., isolated name-calling, the filing of a legitimate safety complaint with state authorities by a pro-Union employee, an employee's mere speculation that the Union was taping his conversations, and the alleged fabrication by a pro-Union employee of a problem with the personnel department-- in any way inhibited the free choice of employees. First, there was no actual threat of physical harm; nor was there any indication in the record that any employee feared for his or her personal safety. Second, there is no evidence that the alleged misconduct was so aggravated and widespread that it contaminated the election climate. Because the Company has not satisfied its burden of proving that pre-election, pro-Union misconduct rendered free choice impossible, see id. at 334 (noting that party seeking to overturn election bears burden of proving misconduct prevented fair election), we find no abuse of discretion in the Board's decision to overrule the Company's objections.**6** The

_____

"vote no" sticker on his car because of fear of vandalism by pro-union employees. The Hearing Officer discredited the employee's testimony based on demeanor-related considerations, his "lack of memory," and a "conflict between [his] prior recorded statement and his testimony at the hearing." We will not "second-guess a fact-finder's determinations about who appeared more `truthful' or `credible.'" Fieldcrest Cannon, Inc. v. NLRB, 97 F.3d 65, 70-72 (4th Cir. 1996).

**6** In addition, MAS argues that the Hearing Officer failed to consider the substance of Unit Employee James Garner's conversations with other employees as evidence that an atmosphere of fear and coercion existed as a direct result of the Union supporters' alleged activities. At the hearing, however, MAS maintained that Garner's testimony was not being offered for the truth of the matter asserted. The Hearing Officer then allowed the testimony for the limited purpose of showing that the conversations took place. To allow the testimony as proof that pro-Union

11

Board's Order will be enforced.

ENFORCEMENT GRANTED

_____

activities created an atmosphere of fear and coercion would, in essence, be an admission of the testimony for its truth. Since admission of the conversations in the form MAS advocates would indeed be hearsay testimony, Fed. R. Evid. 801(c) ("`Hearsay' is a statement, other than one made by the declarant while testifying at the . . . hearing, offered in evidence to prove the truth of the matter asserted."), not falling within any recognized exception, we find no merit in MAS's claim.

12