NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

AMERICAN SPRING BED MANUFAC-
TURING CO., d/b/a American Chain
Link Fence Co., Respondent.

No. 81–1421.

United States Court of Appeals,
First Circuit.

Argued Dec. 11, 1981.

Decided Feb. 19, 1982.

James D. Donathen, Atty., Washington, D.C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Andrew F. Tranovich, Atty., Washington, D.C., were on brief, for petitioner.

Benjamin E. Gordon, Boston, Mass., for respondent.

Before CAMPBELL and BOWNES, Circuit Judges, and WYZANSKI,* Senior District Judge.

BOWNES, Circuit Judge.

In a decision and order dated April 7, 1981, the National Labor Relations Board (the Board) ruled that respondent American

* Of the District of Massachusetts, sitting in designation.

Spring Bed Manufacturing Co., d/b/a American Chain Link Fence Co. (the Company), had committed several unfair labor practices in violation of section 8(a)(1), (3) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3) & (5). The Board, with one exception not pertinent, affirmed the findings and conclusions of the administrative law judge. Specifically, the Board found that the Company had: (1) violated § 8(a)(1) by threatening an employee with discharge because he engaged in protected concerted activity, by soliciting an employee to assist in its anti-union campaign, and by granting wage increases to discourage union activity; (2) violated § 8(a)(3) & (1) by discharging two employees because they sought to unionize the Company's employees; and (3) violated § 8(a)(5) & (1) by refusing to recognize and bargain with the Union (International Union of Electrical, Radio and Machine Workers, AFL–CIO, CLC), which represented a majority of the Company's employees in an appropriate unit, by bargaining directly with employees over wages and by unilaterally granting wage increases to employees.

Upon concluding that these unfair labor practices were indicative of a pervasive and ongoing anti-union animus on the part of the Company, the Board ruled that a fair election was unlikely and that a bargaining order was necessary. The Board now petitions for enforcement of its order: that the Company cease and desist from engaging in various enumerated unfair labor practices; that it offer discharged employees Joseph L. Smith and Kevin W. Scott full and immediate reinstatement plus back pay without prejudice to seniority rights; that it preserve any records necessary to calculate the amount of back pay due under this order; that it recognize and bargain collectively in good faith with the Union; and that it post appropriate notices and notify the Regional Director of steps it has taken to comply with the order.

In deciding whether to enforce the Board's order, our standard of review is whether its findings are supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(e); *NLRB v. Matouk In-*dus., Inc.*, 582 F.2d 125, 128 (1st Cir. 1978); see *NLRB v. Universal Camera Corp.*, 340 U.S. 474, 477–91, 71 S.Ct. 456, 459–466, 95 L.Ed. 456 (1951).

## I. BACKGROUND

The respondent Company, located in Medford, Massachusetts, manufacturers, sells and distributes chain link fence and related products. Its management personnel consists of Guy Mafera, general manager; George Sullivan, assistant general manager; and Kenneth Gardner, plant superintendent. The Company employs about twenty employees, including two working foremen assigned to the shipping and production departments, Juan Rosario (production) and Richard Riccardi (shipping). Both Rosario and Riccardi are stipulated to be in the production and maintenance bargaining unit.

This case arose out of events that occurred in the production department. There were at all relevant times two types of machines in this department: one wiredraw machine that processed raw wire to a diameter suitable for the production of chain link fence, and four wire-weaving machines that wove the processed wire into chain link fence of the desired height. The final production process consisted of taking the rolls of chain link fence from the weaving machine and galvanizing them for resistance to the elements.

Most of the Company's employees were assigned to a 7:30 a.m. to 4:00 p.m. day shift. In order to maximize production and to keep up with customer orders, however, the Company, starting in 1976 and again in the spring of 1977, attempted to run the wiredraw and one of the four wire-weaving machines from 3:30 p.m. to midnight. The Company had difficulty maintaining this shift because the employees assigned to it, including Hector Ortiz and Feliciano Vega, refused to work at night on a regular basis. In early September 1977, the Company tried to solve this problem by hiring Smith and Scott to work as machine operators on the night shift. After a brief training peri-

od, Smith and Scott went to work on the night shift on September 13 and October 3, respectively. Consistent with the Company's past practices, Smith and Scott worked nights on Monday through Thursday and joined the other employees on the day shift on Fridays.

The ALJ found that Smith was hired at the rate of three dollars per hour plus a 25-cent hourly night differential. Smith testified that he believed he was to receive four dollars per hour. The ALJ found that Smith genuinely believed, albeit mistakenly, he had been underpaid. On Friday, September 16, upon receiving his first paycheck covering his night work, Smith discovered the apparent discrepancy and immediately complained to plant superintendent Gardner, who, according to Smith, shrugged him off. Smith testified that, after this discussion, he spoke about his problem later that day with the other production employees. He advised his fellows of the higher wage rate that he believed he had been promised, and some of the other employees told him that they also believed they were not receiving the full pay that the Company had promised them. The ALJ credited Smith's testimony that some of the more senior employees were upset because they found out they were receiving a lower wage rate than he.

During the morning of the following work day, September 19, some of the production employees stopped working. With employee Gilberto Gracia as their spokesman, three or four of them approached assistant manager Sullivan, asked him why Smith was earning more than they, and requested wage increases for themselves. Sullivan responded by telling them that what any other employee was earning was none of their business, but did explain that Smith's wage rate was based upon his assignment to the night shift.

In the afternoon of the same day, Sullivan called Smith into his office where, with Gardner present, Sullivan told Smith that he should stop discussing his pay rate. Smith testified that Sullivan told him that Smith's discussions regarding pay upset the other employees, and that Smith must learn to keep his mouth shut about his pay if he wanted to continue working at the Company. According to Smith, Sullivan told him that if he continued complaining, Sullivan would have "to do something about it."

Sullivan acknowledged having this conversation with Smith about his pay on the day indicated, and agreed that the meeting was precipitated by the production employees having complained earlier in the day because Smith was being paid at a higher wage rate. Sullivan also testified that he asked Smith, "Don't you think what you're making is your own business?", that Smith agreed, apologized for having raised the issue among the employees, and left Sullivan's office. Sullivan unequivocally denied threatening Smith with loss of his job. The ALJ credited Smith over Sullivan on this and all other conflicting statements.

The following payday, September 23, Smith again complained to Gardner about his wages, who advised Smith that he could do nothing about his complaint but suggested that Smith speak with Sullivan. Smith reminded Gardner that Sullivan had told him that he did not want to hear any more complaining. Smith then contacted Louis Reyes, Jr., a union representative, and arranged an organizational meeting with the employees for October 2. Smith personally invited twelve unit employees to the meeting, including Rosario. Scott assisted in the organizational effort by inviting unit employee Kenneth Jewers to the meeting and by speaking with other employees about the Union prior to the meeting. The ALJ found no evidence that any other employee was active in the Union's initial organizational effort and determined that the Union's full-time organizer used Smith as his employee coordinator. The meeting was held on October 2, and twelve employees attended. All twelve, including Smith and Scott, signed union authorization cards.

On October 5, the Union advised the Company that it represented a majority of the employees in the production and maintenance units, and requested the Company to contact it to negotiate a collective bar-

gaining agreement. The same day the Union filed with the Board a petition for a representation election among the Company's production and maintenance employees. The Company received the Union's recognition demand on October 6 and was served with a copy of the election petition on or about October 11.

Upon receiving the Union's demand for recognition, the Company on two occasions—October 6 and 7—interrogated working foreman Rosario, who had attended the October 2 meeting and had signed a union card. Both times Rosario was asked whether he "knew anything about anyone trying to organize a union," and both times he said that he did not. Sometime soon thereafter, general manager Mafera told Rosario that he was aware of and was opposed to the ongoing union activity and that he planned to hold a meeting of all employees to express his anti-union sentiments. Mafera asked Rosario to translate his remarks at the meeting into Spanish for the benefit of the approximately ten Hispanic employees who had difficulty understanding English. From the record, it would appear that Rosario was reluctant to act as a translator at the employee meeting. Mafera had to ask him several times before he agreed to do so.

On October 12 the Company advised the Union that it would not accede to the Union's demand for recognition unless it was chosen in an election and was certified by the Board. On the same date Mafera decided to discharge Smith and Scott and instructed Sullivan to so inform them. Mafera did not confer with Sullivan before reaching this decision even though Sullivan had previously been responsible for all the Company's personnel decisions, including the decision to hire Smith and Scott. Sullivan separately informed Smith and Scott later that day that they were being discharged because the Company was "letting the night shift go." Concurrent with the discharges, the Company informed employees Vega and Ortiz that they were being transferred from the day shift to the night shift, effective October 13. Instead of eliminating the night shift, the Company began operating that shift on a five-night rather than a four-night-a-week basis.

Scott periodically telephoned Sullivan from October 1977 until January 1978 and asked whether there was any possibility of returning to work. During one of these conversations, Sullivan told Scott that there was still no work for him and asked whether Scott was "one of the ones [to] have something to do with the union?" When Scott disavowed any knowledge on the Union, Sullivan replied, "Oh well, it must have been the other person."

Prior to the Union campaign, the company had granted its employees a single, across-the-board pay increase in April of each year. On October 13, a number of employees, led by Rosario, refused to work in protest of the Company's decision to transfer Vega and Ortiz to the night shift. The employees returned to work after Mafera promised to discuss this transfer with Vega and Ortiz. During the ensuing discussion, in which Vega and Ortiz renewed their complaints about working the night shift, the Company gave Vega a ten-cent per hour increase, in addition to the 25-cent hourly differential. Several months later, the Company gave a similar increase to employee Gilberto Gracia.

## II. THE SECTION 8(a)(1) ALLEGATIONS

The test for determining whether an employer has violated § 8(a)(1)[1] is whether the employer's questions, threats, or statements tend to be coercive, not whether the employees are in fact coerced. *Sturgis Newport Bus. Forms, Inc. v. NLRB*, 563 F.2d 1252, 1256 (5th Cir. 1977). The

---

1. Section 8(a)(1) provides: "It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7...." 29 U.S.C. § 158(a)(1). Section 7 provides in pertinent part: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection...." *Id.* § 157.

presence of coercive tendencies in a particular instance of an employer's conduct is to be determined in light of the totality of the circumstances in which that conduct occurred. *NLRB v. Laredo Coca Cola Bottling Co.*, 613 F.2d 1338, 1342 (5th Cir. 1980), *cert. denied*, 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980); *see NLRB v. Styletek, Div. of Pandel-Bradford, Inc.*, 520 F.2d 275, 282 (1st Cir. 1975). We analyze separately the ALJ's findings of threat of discharge, solicitation of an employee to assist in anti-union activity, and granting wage increases to discourage protected activity.

### A. Threat of Discharge

The ALJ reached his finding that the testimony demonstrated that the Company threatened Smith with discharge in violation of § 8(a)(1) by crediting Smith's testimony over that of Sullivan as to the content of their conversation in Sullivan's office on September 19. The ALJ specifically pointed to the following factors as grounds for this credibility determination: (1) Sullivan's and Smith's testimony essentially corroborated each other except for the exact content of Sullivan's statement; (2) Sullivan's testimony regarding his meeting with the group of employees was self-contradictory and evasive, whereas Smith's testimony was direct and forthright; and (3) Gardner's failure to testify as to the content of the critical conversation, to which Gardner was a witness, raised an inference adverse to Sullivan's version of that incident.

■■ Without ruling on the propriety of the ALJ's reliance on any or all of these factors, we point out our very limited scope of review:

> Much weight must be given to the credibility determinations of the ALJ, and while there is evidence pointing both ways, it is not our function to retry the case on a cold record. This court's function is limited to deciding whether on the record as a whole there is substantial evidence to support the Board's findings.

*NLRB v. Blue Hills Cemetery*, 567 F.2d 529, 530 (1st Cir. 1977) (citations omitted). The credibility of witnesses is for the ALJ to determine, and the reviewing court will set aside such findings only when he oversteps the bounds of reason. *NLRB v. New England Lithographic Co., Inc.*, 589 F.2d 29, 37 (1st Cir. 1978); *see NLRB v. Savin Business Machines Corp.*, 649 F.2d 89, 93 (1st Cir. 1981). So long as the ALJ's position represents a choice between two fairly conflicting views, it should be enforced even if this court would justifiably have made a different choice had the matter come before it *de novo*. *NLRB v. Amber Delivery Serv., Inc.*, 651 F.2d 57, 61 (1st Cir. 1981) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)). The credibility determination here had a rational basis and constituted substantial evidence to support the ALJ's finding.

■ The Company also contends that even if Smith's testimony is credited, his wage rate discussions were not protected concerted activity because he misrepresented his rate. We find this contention unpersuasive for several reasons. First, we agree with the Board that Smith's discussions of his wages, because they touched off a chain of discourse among his fellow employees during which they too expressed their own wage complaints, did constitute activity protected under the Act. *See Jeannette Corp.*, 217 N.L.R.B. 653, 656–57 (1975). *See also Jeannette Corp. v. NLRB*, 532 F.2d 916, 919 (3d Cir. 1976) (in enforcing Board's order, court noted that discord generated by what employees perceived to be unjustified wage differentials provided basis for persistent concerted activity). Moreover, what upset the other employees who discussed their wages with Smith was not Smith's mistaken statement that he should be earning four dollars per hour for night work, but rather his correct statement that he was then earning $3.25 per hour for such work when they were earning less. In addition, the record fully supports, and the Company does not challenge, the ALJ's finding that Smith actually harbored the mistaken belief that he had been underpaid. Therefore, this case is distinguishable from *Plastic Composites Corp.*, 210 N.L.R.B. 728 (1974), upon which the Company relies, be-

cause there not only did the subsequently discharged employee willfully misrepresent his wage rate at a prior job to his fellow employees, but their discussion did not precipitate concerted action on the subject by any of the employees with whom he spoke. *Id.* at 738.

We therefore affirm the Board's finding that the Company violated § 8(a)(1) by threatening to discharge Smith for engaging in protected concerted activity.

### B. *Solicitation of Rosario to Assist in the Company's Anti-Union Campaign*

█ In finding that the Company violated § 8(a)(1) by having Rosario translate the Company's anti-union sentiments for the Spanish-speaking employees, the Board found that the Company had engaged in conduct that could reasonably be said to tend to interfere with the free exercise of the employee's rights under the Act. *See Electrical Fittings Corp.*, 216 N.L.R.B. 1076, 1076 (1975). The Board reasoned that Mafera's repeated requests put Rosario in the untenable position of either acceding to Mafera's proposition, thereby inhibiting his freedom of expression under § 7, or refusing to do so, thus revealing his pro-union sentiments. We disagree. The record shows that translating for Mafera was one of Rosario's daily responsibilities, and the other employees could reasonably have ascertained that Rosario was merely undertaking a ministerial duty in translating the Company's anti-union sentiments, especially in light of Rosario's having recently signed a union card. Additionally, the group that needed translation was very small—ten employees—to whom Rosario could easily convey his true feelings about the Union after the meeting. Finally, after acting as translator at the meeting, Rosario confronted Mafera on behalf of the employees who had stopped working on October 13 to protest the transfer of Vega and Ortiz to the night shift; this also suggests that the employer's actions did not have a coercive tendency under these circumstances. *See Electrical Fittings Corp.*, 216 N.L.R.B. at 1076.

We accordingly find that the Company's use of Rosario as a translator to explain its anti-union sentiments did not violate § 8(a)(1), and we reverse this part of the Board's decision and order.

### C. *Granting of Wage Increases to Discourage Union Activity*

█ We next review the lawfulness of the Company's grant of a ten-cent per hour wage increase to employees Vega and Gracia. It is well settled that § 8(a)(1) prohibits an employer from conferring benefits upon employees when such conduct might reasonably tend to discourage employee support for union representation. *See NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 459–460, 11 L.Ed.2d 435 (1964); *NLRB v. Rich's of Plymouth, Inc.*, 578 F.2d 880, 884 (1st Cir. 1978). We adhere to the two-step analysis set forth in *NLRB v. Styletek, Div. of Pandel-Bradford, Inc.*, 520 F.2d at 279:

> In *NLRB v. Gotham Indus., Inc.*, 406 F.2d 1306, 1309 (1st Cir. 1969), we pointed out that there were two ingredients to a § 8(a)(1) violation case based upon an employer's granting of benefits to his employees. The Board must first prove that the employer knew or should have known, when he conferred the benefits, that a union was organizing or an election was pending. *Id.* at 1310. Second, it must appear, at least inferentially, that the benefits were granted with the purpose of interfering with the employee's choice to unionize. *Id.* at 1309; *see NLRB v. Exchange Parts Co.*, 375 U.S. 405 [84 S.Ct. 457, 11 L.Ed.2d 435] (1964). If they were granted primarily for a legitimate business purpose, they do not violate the Act.

█ Because the Company had received the Union's demand for recognition prior to granting the wage increases to Vega and Gracia, knowledge is not an issue. The sole question is whether, at least inferentially, the Company granted the pay raises to discourage union activity.

Not only was Vega's raise unprecedented—the Company's practice had been to grant wage increases across-the-board in

April of each year—but it was conferred in the midst of the Union campaign, on the day following the October 12 discharges of Smith and Scott, within days of the Company's receipt of the Union recognition demand and election petition, and during the period that the Company had questioned Rosario about the Union. In addition, the raise was granted immediately following a work stoppage and protest and Mafera's discussion with Vega and Ortiz regarding their complaints about night shift work. The timing of the pay raise thus shifts the burden to the Company to justify both the fact and the timing of the increase as based upon independent business reasons and not to quell employee unrest and to discourage union activity. *See NLRB v. Rich's of Plymouth*, 578 F.2d at 884.

To rebut the inference of an unlawful motive in granting the pay raise, Mafera testified that the raise was agreed upon by himself and Vega solely to compensate Vega for the additional cost for gasoline necessitated by Vega having to drive Ortiz to work each night because Ortiz had lost his driver's license. In rejecting this argument, the ALJ relied on the fact that the Company had not previously granted any similar compensation for travel expenses and that Vega's raise was carried on the books as an increase in his base pay rather than as reimbursement for his travel expenses.

We conclude that the ALJ could have reasonably inferred that, but for the ongoing union activity at the time, the Company would not have granted the raise. We therefore find substantial evidence for the ALJ's conclusion that because the increase was granted in the midst of a union campaign, it was intended to quell employee unrest and to discourage unionization efforts in violation of § 8(a)(1). *See NLRB v. Styletek, Div. of Pandel-Bradford, Inc.*, 520 F.2d at 281.

 As to the wage increase granted to Gracia, however, we reach a different result. Gracia was hired in February 1977. On February 23, 1978, he received a ten-cent per hour wage increase. The ALJ

found that "Garcia's [sic] February 1978 increase is unexplained." This ignores Sullivan's uncontroverted testimony that in April 1977 he promised to give Gracia an increase on his anniversary date with the Company. When Sullivan made that promise, no unionizing efforts had begun. Although Gracia's increase may, as the ALJ found, have had a tendency to diminish union appeal to the workers, there is no evidence in the record, except the fact that it was granted, from which it can be inferred that the increase was given to quell employee unrest or would not have been granted but for the unionization effort.

## III. THE SECTION 8(a)(3) ALLEGATIONS—DISCRIMINATORY DISCHARGES OF SMITH AND SCOTT

Section 8(a)(3) of the Act prohibits an employee from discriminating "in regard to hire or tenure of employment or any other term or condition of employment ... to discourage membership in any labor organization...." 29 U.S.C. § 158(a)(3). The well-established test in this circuit for an illegal discharge is whether the employee would not have been discharged "but for" his protected activity. *NLRB v. Wright Line, A Division of Wright Line, Inc.*, 662 F.2d 899, 903 (1st Cir. 1981); *NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d 666, 671 (1st Cir. 1979); *cf. Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 417, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979); *Mt. Healthy v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

 Our initial inquiry is whether the general counsel made a *prima facie* showing that protected conduct was a motivating and significant factor in the discharge decision. *NLRB v. Wright Line*, 662 F.2d at 904; *NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d at 671. If he did, the employer bears the burden of producing credible evidence to rebut the *prima facie* case by proving that it had a "good" reason, sufficient in itself, to produce the discharge. *Id., NLRB v. Wright Line*, 662 F.2d at 904–05; *NLRB v. Amber Delivery Serv.*,

*Inc.*, 651 F.2d 57, 69 (1st Cir. 1981). This shift does not impose on the employer the overall burden of proving itself innocent of violating the Act. *NLRB v. Wright Line*, 662 F.2d at 905. Rather, the employer must simply produce sufficient evidence "to balance, not to outweigh," the evidence produced by the general counsel. *Id.*[2] The Board may reject the employer's asserted defense, however, by reasonably inferring that the alleged justification is merely a pretext. *NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d at 675.

■ We will uphold the Board's finding that the general counsel made out a *prima facie* case only if there is substantial evidence demonstrating that the Company had knowledge of the employees' union activities and therefore could have been motivated by anti-union animus. *See NLRB v. South Shore Hospital*, 571 F.2d 677, 682–84 (1st Cir. 1978). Here, the Board adopted the ALJ's extensive findings of fact from which he inferred that the Company knew that Smith and Scott were active in the Union campaign and was motivated by anti-union animus in terminating them. We agree with the Board that the record contains substantial evidence of the Company's animus toward the Union. Mafera admitted on the record that he was opposed to the Union and said so at the employees' meeting. He also threatened Smith unlawfully for the latter's protected activity. In reviewing the adequacy of the general counsel's *prima facie* case, therefore, the critical question is whether the Company actually knew that Smith and Scott were engaged in union activity when it terminated their jobs.

■ We begin with the so-called "small-plant" doctrine, which permits an inference that the Company knew about Smith's and Scott's union activity from the relatively small size of the plant and staff. *NLRB v. Joseph Antell, Inc.*, 358 F.2d 880, 882 (1st Cir. 1966). A possibility of observation may be sufficient provided there is "other, affirmative evidence indicating that the employer in fact knew." *Id.* at 833. Under these circumstances, direct knowledge is not necessary. Affirmative evidence for this purpose may also be the same evidence that allows the inference that the Company was motivated by anti-union animus: the soundness of the reasons with which the employer seeks to justify the discharge; the procedures used to discharge the employee; the timing of the discharge; and the simultaneous occurrence of other unfair labor practices. *See, e.g., Statler Indus. Inc., v. NLRB*, 644 F.2d 902, 906 (1st Cir. 1981); *NLRB v. South Shore Hospital*, 571 F.2d at 684; *NLRB v. Joseph Antell, Inc.*, 358 F.2d at 883.

■ Here, the ALJ inferred that, although no Company official admitted observing Smith's and Scott's union activities, the Company knew that these two employees were the leading union advocates. We think the facts justified this inference. Smith and Scott were the only employees who openly espoused support for the Union. Smith initially contacted a union representative to arrange an organizational meeting. Both Smith and Scott approached other employees, urging them to attend the meeting, and both men attended the meeting and signed union cards. In mid-September, less than one month prior to the discharges, the Company learned of Smith's conversations with his fellow employees regarding wages and threatened Smith with loss of his job if such conversations continued. In late September and early October, Smith and Scott talked openly with other employees at the plant about the upcoming October 2 meeting. The evidence shows that plant superintendent Gardner and foreman Rosario

---

2. Although *Wright Line* was decided after the Board's decision here, we see no reason to remand this aspect of the case. Neither the ALJ nor the Board decided this case upon the "niceties of burdens of proof." *NLRB v. Magnesium Casting Co., Inc.*, 668 F.2d 13 at 16 (1st Cir. 1981). Instead, the ALJ found evidence of anti-union motive and then proceeded to find that the Company's allegedly legitimate reasons for both discharges were a pretext.

both spent a majority of their time working in the plant in the midst of the unit employees. It is also undisputed that the Company's top management spoke frequently with Gardner and Rosario regarding work-related matters in the plant. It was not unreasonable to infer that knowledge of Smith's and Scott's union organizing activities reached top management.

Additionally, the timing of the October 12 discharges is significant. They occurred a short time after Smith's and Scott's discussions with other employees about the October 2 meeting and only a few days after the Company received the Union recognition demand and election petition. *See NLRB v. Amber Delivery Serv., Inc.*, 651 F.2d at 69. It is also significant that the Company told Smith and Scott that they were being discharged because the Company was "letting the night shift go," when at the same time the Company was transferring Vega and Ortiz to the night shift to replace them. Moreover, Mafera personally ordered the discharges. This was unprecedented because, as the record shows, Sullivan had made all hiring and firing decisions prior thereto.

All of these factors, together with the unlawful grant of a wage increase to Vega, and the evidence of the Company's anti-union animus discussed *supra*, provide substantial evidence that the general counsel established a *prima facie* case that the Company's discharge of Smith and Scott was motivated by their union activities. We therefore turn to examine whether the Company has produced sufficient evidence that it would have discharged these men absent their participation in protected activities.

■ The Company asserts that there were two legitimate business reasons for the discharges. The first reason was that it "was letting the night shift go" due to low production. This is negated by the fact that the Company continued the night shift with Vega and Ortiz replacing Smith and

Scott. Moreover, the Company's claim of low production was not mentioned to either Smith or Scott at any time prior to their terminations. Further, the record shows that production on October 6 and 11, the only nights that Smith and Scott worked alone, was hampered by circumstances wholly outside the employees' control: an on-the-job injury to Scott on the 6th and repeated machine failure on the 11th.

■ The Company's second justification for the discharges was its determination that it was employing too many machine operators. This contrasts sharply with the Company's long history of employing two or three extra machine operators.

Based upon the foregoing reasons, the Board rejected the Company's defenses as pretexts to mask its unlawful motives. We agree that the discharges of Smith and Scott violated § 8(a)(3) of the Act.

## IV. THE SECTION 8(a)(5) ALLEGATIONS AND BARGAINING ORDER

The Board supportably found that the Union represented a majority of the employees in the appropriate bargaining unit and sought recognition by the Company in a written demand letter dated October 5 and received by the Company on October 6. In a letter dated October 12, the Company refused to recognize the Union and had not, prior to the Board's decision, changed its position. Although the Company claimed that it harbored good faith doubts about the validity of the authorization cards and the Union's majority, the Board rejected this defense, noting that the Company, while refusing to bargain, also engaged in the series of the various unfair labor practices violative of § 8(a)(1) and (3) that we have discussed *supra*. This, according to the Board, provided the requisite proof of a § 8(a)(5) violation.

■ Section 8(a)(5) prohibits an employer from refusing "to bargain collectively with the representatives of his employ-

ees. . . ." 29 U.S.C. § 158(a)(5). The Supreme Court has ruled, however, that an employer does not have an absolute obligation to recognize and bargain with a union merely upon a showing of a card majority. He has a right to insist upon an election unless he engages "in contemporaneous unfair labor practices likely to destroy the union's majority and seriously impede the election." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 600, 89 S.Ct. 1918, 1933, 23 L.Ed.2d 547 (1969), *reh'g denied*, 396 U.S. 869, 90 S.Ct. 35, 24 L.Ed.2d 123 (1969); *accord, Drug Package, Inc. v. NLRB*, 570 F.2d 1340, 1346 (8th Cir. 1978). We think that in cases such as this when a showing of a union's valid card majority has been made, a determination of whether a § 8(a)(5) violation has been committed requires essentially the same analysis as whether a bargaining order should issue. *See First Lakewood Assoc. v. NLRB*, 582 F.2d 416, 422 (7th Cir. 1978); *Peerless of America, Inc. v. NLRB*, 484 F.2d 1108, 1115 (7th Cir. 1973). We therefore consider both issues together.

We are fully aware of the deference accorded the Board's expertise in fashioning remedies. *E.g., NLRB v. Gissel Packing Co.*, 395 U.S. at 612 n.32, 89 S.Ct. at 1939 n.32; *NLRB v. Pilgrim Foods, Inc.*, 591 F.2d 110, 120 (1st Cir. 1978). Nevertheless, to ensure evenhanded imposition of the extreme remedy of a bargaining order, as well as to facilitate meaningful and informed appellate review, we, like other circuits, have insisted that the Board articulate specific examples and precise reasons for concluding that: (1) the employer's unfair labor practices so undermined the Union's majority that conducting a fair election would be unlikely; (2) the employer's unlawful conduct was likely to continue; and (3) the ordinary remedies of back pay, reinstatement, and posting of notices would be inadequate to ensure a fair election. *See, e.g., NLRB v. Pilgrim Foods, Inc.*, 591 F.2d at 120; *NLRB v. Matouk Indus., Inc.*, 582 F.2d at 130. *See also NLRB v. Armcor Indus., Inc.*, 535 F.2d 239, 244 (3d Cir. 1976); *Peerless of America, Inc.*, 484 F.2d at 1118. *See generally NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208, 215 (2d Cir. 1980).

The ALJ's findings[3] pay lip service to *Gissel*, but are bereft of any reasons why the unfair labor practice would "likely destroy the union's majority and seriously impede the election." Indeed, the tenor of the remarks suggest that the ALJ thought the

---

**3.** "The timing and combination of Respondent's activities I have found unlawful herein persuade me that as soon as the employees herein overtly engaged in protected concerted activities and demonstrated therein interest in unionization, Respondent embarked in a program to erode and frustrate that activity. There is no need to recount those observations already made regarding the dispatch with which Respondent took action to mollify the various employee concerns with which it had been confronted. As to the discharges of Smith and Scott, I conceive of no other activity by an employer which is more outrageous and pervasive than to have ridded itself of the two leading union adherents during the height of their exercise of Section 7 rights. I consider the unilateral grant of wage increases and the direct bargaining with employees to signal to them that they need not exercise their Section 7 rights to gain improvements in their wages, hours and other terms and conditions of employment. It is inescapable that employees presented with such a condition cannot make the free choice which the Act contemplates in an election. (citation omitted). Apparently, Respondent was not simply content with discharging Smith and Scott but later granted Vega the unilateral wage increase. I consider the February 1978 unilateral grant of a wage increase to Gracia an extremely persuasive indicator of the permanent nature of the unfair labor practices found herein. In this context, there can be no doubt that it is unlikely a fair and untrammeled election could be conducted. Accordingly, the order will require Respondent to recognize and bargain collectively with the Union, upon request, concerning wages, hours and other terms and conditions of employment of the employees in the appropriate bargaining unit. (citation omitted).

"Inasmuch as I have concluded that Respondent's unfair labor practices clearly undermine the Union's majority status, in view of my finding that the Union enjoyed majority status on October 6, 1977, the date on which Respondent received the Union's bargaining demand, the bargaining order will be retroactive to that date. (citation omitted)." App. at 27–28.

Company should be punished for what he considered egregious unfair labor practices. The purpose of a bargaining order is not retribution but to ensure a fair election. Faced with the Board's inadequate findings and because we have reversed the Board on two issues that loomed large in its finding of a § 8(a)(5) violation and the decision to issue a bargaining order, we think it appropriate to analyze the record ourselves to determine whether a bargaining order should issue. *See NLRB v. Pilgrim Foods, Inc.*, 591 F.2d at 120; *First Lakewood Assoc. v. NLRB*, 582 F.2d at 423–24; *Walgreen Co. v. NLRB*, 509 F.2d 1014, 1017–19 & n.5 (7th Cir. 1975). *See generally R. Gorman, LABOR LAW*, at 100–04 (1976).

The unfair labor practices remaining after our pruning consist of the threat to Smith, the firing of Smith and Scott, and the unilateral wage increase given to Vega. The threat issued to Smith on September 19 did not prevent him from soon thereafter contacting a union representative nor from encouraging his fellows to attend the organizational meeting. The illegal discharges of Smith and Scott were no doubt serious and permanent in nature. *See NLRB v. Amber Delivery Serv., Inc.*, 651 F.2d at 70. The record reflects, however, that on the day immediately following these discharges, a group of other employes in the unit walked off the job and challenged Mafera about his decision to transfer Vega and Ortiz to the night shift. The Company's unlawful grant of a wage increase to Vega soon thereafter undoubtedly did to some extent quell employee unrest. We detect no evidence, however, that any of the employees were either intimidated or coerced insofar as their ability to make a free choice in electing a union representative. On the demand-for-recognition date, October 6, the appropriate bargaining unit consisted of nineteen employees, eleven of whom signed authorization cards. Even after the Company discharged Smith and Scott, the Union enjoyed a majority out of the remaining seventeen employees. No facts were found, nor can we find any, that suggest that this margin had been jeopardized in any concrete and tangible way by any of the Company's actions.

To support his conclusion that the Company's unlawful conduct was likely to recur, the ALJ relied exclusively upon his finding that the Company granted a unilateral wage increase in February 1978 to Gracia. We have found, however, that this did not constitute an unfair labor practice and there is no evidence that it in any way affected the majority status of the Union. We think that the ALJ's sole reliance on the February 1978 pay raise was insufficient to support his determination that the Company would continue to commit unfair labor practices in the future.

██ We point out that the Company, although remaining consistently opposed to the Union, violated the Act by actions that occurred in September and October of 1977 only. The Board has proffered no reasons to explain why the Company would not obey a cease and desist order accompanied by the posting of appropriate notices. The fact that the employees are made aware that Smith and Scott are entitled to back pay and reinstatement will certainly not diminish the Union's standing in the eyes of the employees. That Rosario had freely exercised his § 7 rights in supporting the Union even though he had translated Mafera's anti-union position to the other unit employees strengthens our conviction that a fair, properly supervised election could be held. It would be otherwise if there were evidence that Rosario had harbored anti-union sentiments himself or felt inhibited by his role as translator. A secret election is the preferred method of determining a bargaining unit's representative and a bargaining order should be enforced only when a fair election is not feasible. *NLRB v. Gissel Packing Co.*, 395 U.S. at 602, 89 S.Ct. at 1934. In this case we believe that a fair election can be ensured through the traditional remedies of reinstatement, issuance of a cease and desist order, and the posting of appropriate notices.

We conclude that the Company's conduct did not justify the Board's stripping it and the employees of a right to an election. Consequently, we reverse the Board's determination that the Company violated § 8(a)(5) by refusing to bargain with the Union after October 6, 1977. Because the Company had no duty to bargain exclusively with the Union, we find that any bargaining that may have occurred between Vega and the Company after Vega's transfer to the night shift did not violate § 8(a)(5). Nor did the Company run afoul of this section by conferring wage increases on Vega and Gracia without first notifying and bargaining with the Union.

The bargaining order is vacated. The order of the Board is enforced except insofar as it orders the Company to cease enlisting support of their employees to translate an anti-union position and to cease refusing to recognize and bargain with the Union as the exclusive collective bargaining representative of the employees in the unit. The notice shall be modified accordingly and copies in English and Spanish shall be posted as directed in paragraph 2(d) of that section of the ALJ's decision entitled "Order." We assume that the Board will insist upon an expeditious and prompt election by secret ballot.

*Affirmed in part, reversed in part; remanded to the Board for further proceedings consistent herewith.*