**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HORIZON AIR SERVICES, INC., Respondent.**

No. 84–1869.

United States Court of Appeals, First Circuit.

Argued March 8, 1985.

Decided April 26, 1985.

Victoria A. Higman, Washington, D.C., with whom Linda Dreeben, Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C., were on brief for petitioner.

Philip G. Boyle, Boston, Mass., with whom Patricia A. Day and Holland, Crowe & Drachman, Boston, Mass., were on brief for respondent.

Before BREYER and TORRUELLA, Circuit Judges, and SELYA,* District Judge.

SELYA, District Judge.

■ The National Labor Relations Board (Board) asks us to enforce its order of September 24, 1984, finding Horizon Air Services, Inc. (Horizon) guilty of unfair labor practices in violation of §§ 8(a)(1), (3), and (5) of the National Labor Relations Act (the Act), 29 U.S.C. §§ 158(a)(1), (3), and (5), and ordering Horizon to bargain with the International Association of Machinists and Aerospace Workers, AFL–CIO (Union). The Board found,[1] in substance, that Horizon had: (i) coercively interrogated employees concerning union activities (their own and those of other employees) and threatened workers with discharge and plant closure if they engaged in organizing activities or if the union became the collective bargaining representative, in violation of § 8(a)(1) of the Act; (ii) taken punitive actions against pro-Union workers, *e.g.*, fired off a written warning to a Union adherent and reduced his working hours, discharged two employees for Union activity, and implemented new working conditions among its employees, all in violation of §§ 8(a)(1) and (3) of the Act; and (iii) refused to recognize and bargain in good faith with the Union as the collective bargaining representative for Horizon's employees, in violation of §§ 8(a)(1) and (5) of the Act.

In his order of December 30, 1983, the ALJ directed Horizon to cease and desist from the melange of unfair labor practices which had occurred, to reinstate the two discharged employees with backpay (and, ancillary thereto, to expunge any memorial-

---

* Of the District of Rhode Island, sitting by designation.

1. The Board adopted the recommended findings and order of the administrative law judge (ALJ) who heard the case de novo in September of 1983. It is well settled that the Board need not make independent findings or conduct a separate analysis of the factors prompting the order if it specifically adopts the findings and reasoning of the ALJ. *See, e.g., NLRB v. Windsor Industries, Inc.,* 730 F.2d 860, 866 (2d Cir.1984); *Kenworth Trucks of Philadelphia, Inc. v. NLRB,* 580 F.2d 55, 61–63 (3d Cir.1978).

ization of the firings and to preserve records necessary to calculate backpay), to post appropriate notices, and, notwithstanding the absence of an election, to recognize and bargain with the Union. The ALJ further instructed Horizon to notify the Board's regional director of steps taken to comply with the order. In affirming the ALJ's remediative order, the Board reiterated his finding that Horizon's conduct was so egregious and pervasive that a fair election could not be held through the use of more traditional constraints. The Board therefore concluded that the bargaining order was a condign remedy in this situation.

Horizon asks us to reverse the Board's findings of unfair labor practices and contends that the issuance of a bargaining order was unwarranted and should not be enforced by this court.

## I.

■ We acknowledge at the outset that, as to matters of fact, the pertinent standard of appellate review is whether the Board's findings are supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(e); *see NLRB v. American Spring Bed Mfg. Co.*, 670 F.2d 1236, 1239 (1st Cir.1982); *NLRB v. Matouk Indus., Inc.*, 582 F.2d 125, 128 (1st Cir.1978). We note, as well, the prudential precept that much weight must be given to the ALJ's credibility determinations. *American Spring Bed Mfg. Co.*, 670 F.2d at 1242; *NLRB v. Blue Hills Cemetery*, 567 F.2d 529, 530 (1st Cir.1977). Our chore is one of appellate review only. "[I]t is not our function to retry the case on a cold record." *Id.* We present the facts in the manner most hospitable to the Board's determinations, consistent with requisite record support.

Horizon is a Massachusetts corporation with its principal place of business located upon the grounds of Logan International Airport in East Boston. It operates an airfreight pickup and delivery service and an associated warehouse facility at the East Boston site. The villains of the piece, in the Board's view, are Joseph Ryan (Horizon's sole shareholder and president) and Mary Turilli (vice president, operations manager, and dispatcher). Horizon utilizes sundry vans and trucks in the conduct of its business; as of May 1, 1983, it employed twelve warehousemen and drivers, who collectively comprised the bargaining unit in question. Horizon has apparently been a non-union shop since it began operations in January, 1978.

The effort to get the Union off the launching pad was initiated in mid-1983 by two then-employees, Albert Solomon and Christopher Heinz. On May 6, 1983, Solomon made initial contact with the Union. Thereafter, on May 9, he met with Heinz and with the Union's representative (Celona). By the following day, the engines were revving up: Solomon and Heinz had obtained signed authorization cards from seven of the twelve employees in the bargaining unit.

Word spread quickly to the control tower and Ryan flew to the attack. On May 11, he interviewed several employees in his office. Heinz was interrogated that morning, and the ALJ found that Ryan threatened him both with discharge and with closing the plant if a union came in to organize the workforce. Subsequently, on May 13, Ryan questioned a former employee, Leonard Torto, about the extent of union activity among Horizon's crew and about the nature of employee grievances. Torto described some of the complaints, but did not divulge the source of the incipient union groundswell. Ryan told him that there was a "cancer" in the company and that he would "cut it out." Later that day, Ryan cross-questioned another employee, Michael Fazio, about his knowledge of union activities and specifically, as to whether Heinz and Solomon were the "instigators" of such efforts. In short order, Ryan took decisive steps to abort the Union's flight plan: he discharged Heinz, handed him an envelope containing three weeks severance pay (which Heinz refused), and told him to call the company lawyer. (No contemporaneous reason was proffered for the discharge.) Ryan then grilled at least four

staffers (including Fazio) as to whether or not they had signed authorization cards. And, Ryan kept a personal "hit list"—a roster of each employee and his/her professed sympathies and/or antipathies regarding unionization.

Beginning on May 16, and reflected in the paychecks of May 19, Horizon instituted the practice of giving employees paystubs showing their weekly pay, with the number of regular hours worked, the number of overtime hours worked, and the pay therefor. Prior to May 16, employees working the normal day shift from 8 a.m. to 5 p.m. were paid for eight hours of work. The practice was to pay employees straight time for work performed after 5 p.m. The changes in working conditions which were implemented as of May 16 included the payment of time and a half for overtime work and a change in the normal day shift (thereafter 8 a.m. to 4 p.m.), with overtime paid after 4 p.m. Each and all of these innovations were designed to ameliorate specific employee complaints, as previously reported by Torto to Ryan.

Solomon, too, was caught within the sweep of Horizon's protective radar. The facts regarding his discharge are as follows. On May 14, Ryan attempted to segregate Solomon from the other employees by reassigning him to an 11 p.m. to 7 a.m. shift as a night watchman. Although Ryan later rescinded this decision (apparently on the advice of counsel), Solomon, upon reporting to work on Tuesday, May 17, was told that there would be "no overtime, no nothing" for him. The record shows that Solomon did not work on May 18 due to illness. On May 20, he received a written warning for his failure to call in two days before (although he testified that he had made several attempts to do so). During the ensuing week, Solomon was repeatedly advised that there was no work for him and that he should not "bother coming in until

this is over". On Saturday, May 28, Solomon received a letter stating that he was being discharged due to a "phase-out" of Horizon's van operations. Solomon's separation from Horizon's service thus became a reality. Yet, it is clear beyond peradventure that Solomon's work was performed by other employees after his discharge and that there had been no decrease in the delivery of freight by vans.

On June 9, 1983, the Union requested by letter that Horizon recognize it as the bargaining agent for the unit. The employer refused to do so. On June 14, the Union filed a petition for certification.

## II.

▆▆▆▆ Horizon has offered no basis or argument for overturning the Board's findings and conclusions with regard to the §§ 8(a)(1) and (3) violations based on threats, coercive interrogations, and improvements in working conditions. So, the employer has effectively waived the right to object to these findings as erroneous. *See, e.g., NLRB v. Valley Plaza, Inc.,* 715 F.2d 237, 240–41 (6th Cir.1983); *NLRB v. Nevis Industries, Inc.,* 647 F.2d 905, 908 (9th Cir.1981); *NLRB v. Jacob E. Decker and Sons,* 569 F.2d 357, 360 (5th Cir.1978); *Dreis & Krump Manufacturing Co. v. NLRB,* 544 F.2d 320, 325 (7th Cir.1976). Enforcement proceedings cannot be stalemated on a wing and a prayer. Moreover, the Board's findings in these respects are clearly bulwarked by substantial—indeed, overpowering—evidence on the record as a whole and therefore should be upheld on review. 29 U.S.C. § 160(e). *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477–91, 71 S.Ct. 456, 459–66, 95 L.Ed. 456 (1951); *American Spring Bed Mfg. Co.,* 670 F.2d at 1239.

Horizon does, however, dispute the Board's findings that §§ 8(a)(1) and (3) [2]

---

**2.** Section 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in section 7...." 29 U.S.C. § 158(a)(1) (1982). (Section 7 in turn guarantees employees the right to form, join, or

assist labor organizations and to engage in other concerted activities for the purpose of collective bargaining. *Id.* at § 157.) Section 8(a)(3) of the Act provides that it is an unfair labor practice for an employer to discriminate in regard to hire or tenure of employment or any term or

were transgressed with regard to the discharges of Heinz and Solomon, claiming that the Board failed properly to scrutinize these dismissals; and that, had the Board applied the correct test, it would have determined that these were permissible "mixed motive" discharges. Horizon's asseveration, stripped to its bare fuselage, is that, irrespective of any anti-union animus, it would have taken action against Heinz and Solomon even had they not been engaged in protected activity. Therefore, its thesis runs, the Board's order irremissibly immunized union adherents against legitimate discipline for genuine shortcomings. But, the appellant's argument is doubly flawed: it both distorts the applicable law and ignores any realistic appraisal of the relevant facts.

■ Horizon mischaracterizes the fundamental allocation of the burden of proof in cases of dual motive discharges. The Supreme Court, in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 2471, 76 L.Ed.2d 667 (1983) (approving *Wright Line*, 251 NLRB 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982)), took pains to spell out the precise nature of the employer's burden in this wise. Under this criterion, once the Board's General Counsel has proved that the employee's protected conduct was a substantial or motivating factor for the discharge, the company must do more than merely produce some evidence of a legitimate motive to escape liability. Rather, the employer must prove by a preponderance of the evidence that, although the employee's protected conduct may have been an additional causative factor for the discharge, the company was motivated principally by the employee's unprotected conduct to such an extent that it would have dismissed the worker in any event (whether or not he/she had engaged in sacrosanct activities). *Transportation Management Corp.*, 103 S.Ct. at 2473. This effectively imposes an affirmative obligation upon the employer, who must convince the trier of fact that the legitimate motive for discharge existed and was sufficiently compelling. *Id.*

■ In the case at bar, careful review of the facts plainly supports the Board's finding that Horizon failed (miserably) to sustain its burden of proof. In the metier of the workplace, the proffer never got off the ground. Ryan testified that Heinz was fired due to his "disruptive" behavior and unsatisfactory job performance, and that Heinz had agreed in December, 1982 that he would seek other employment. There is nothing in the record, however, save for the uncorroborated testimony of Ryan, that indicates that Heinz was an incompetent or insubordinate employee. The ALJ pointedly found that Ryan was not a believable witness. Unless such a determination was unreasonable, we should defer to his credibility judgments. *Rikal, Inc. v. NLRB*, 721 F.2d 402, 406 (1st Cir.1983); *American Spring Bed Mfg. Co.*, 670 F.2d at 1242; *Blue Hills Cemetery*, 567 F.2d at 530. *See also NLRB v. Walton Manufacturing Co.*, 369 U.S. 404, 408, 82 S.Ct. 853, 855, 7 L.Ed.2d 829 (1962). And, there is no such reason here. Ryan's testimony was thoroughly discredited at the hearing. Moreover, the mere fact that Heinz and Ryan had a previous understanding that the former would leave Horizon's employ upon obtaining another job does not somehow endow Horizon with a permissible reason for discharging Heinz coincident with the union activity. The disruptive bent cited by Ryan was, in the first place, pretextual.[3]

condition of employment in order to discourage membership in a labor organization. *Id.* at § 158(a)(3).

3. The ALJ's findings indicate that the description of Heinz as "disruptive" related primarily to his supposed criticism of the work performance of Turilli. The ALJ did not accept Heinz's alleged conduct as having been naughty; nor do we. And, Horizon's argument that the fact that Heinz surfaced at the center of employee unrest on May 12 was merely the last straw in a series of unprotected activities trenches upon an admission of unlawful motive for the discharge. At best, this convoluted reasoning constitutes a paralogical defense to the charged § 8(a)(3) violation.

The suggestion was raised only belatedly, comprised innocuous criticism, and was wholly undocumented. In the second place, Heinz's conduct was so integrally related to his protected endeavors that no justifiable motive could rationally be inferred to buttress the discharge.

■ Much the same holds true for Solomon's termination. Horizon's ostensible reason was that it was phasing out its van operations as stated in the lay-off notice received by Solomon on May 28. But, there was no decline in Horizon's van service, Solomon was replaced by another employee, and an additional part-time van driver had been hired for the summer. Since the van operations were not, in fact, phased out, the alleged motive for the discharge must have been apocryphal and subsequent excuses given in testimony before the ALJ must likewise have been feigned. Ryan's description of Solomon as a "violent" and "disruptive" employee who was disliked by his co-workers, can only be characterized as a flight of fancy. Ryan testified that he had reassigned Solomon to the night shift because he feared for his safety. Such an explanation beggars credulity, especially in light of Ryan's hasty rescission of the order.

Horizon's plea as to these points is a farrago of legal error and factual inconsistency. Only if the record is read with the most singleminded reverence for coincidence could Ryan's lame assertions be entitled to any credit. The ALJ chose to disregard Ryan's polemical vendaval in favor of a more rational appraisal of the credible evidence before him. And, since we have long since abandoned faith in the tooth fairy and like velleities, we conclude that the Board's finding that both Heinz and Solomon were let go because of their organizational initiatives, in violation of §§ 8(a)(1) and (3) of the Act, is unimpeachable.

## III.

A closer issue in this case is whether the Board acted within its discretion in issuing a bargaining order to remedy the twin evils of the employer's unfair labor practices and its refusal to recognize and bargain with the Union in violation of § 8(a)(5) of the Act.[4] Although there is ordinarily a mutual right to a secret election at which the ballot box tally will determine the existence *vel non* of a card majority, the Supreme Court, in *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), approved the Board's preemption of such an election and the alternative use of a bargaining order in cases "where an employer has committed independent unfair labor practices which have made the holding of a fair election unlikely." *Id.* at 610, 89 S.Ct. at 1938. The Court delineated two generic sets of circumstances in which the issuance of a bargaining order by the Board would be appropriate. The first category requires an "exceptional" case in which the employer's conduct was so "outrageous" and "pervasive" that traditional remedies, such as an election, could not eliminate its coercive effect. *Id.* at 613–14, 89 S.Ct. at 1939–40. If an employer's behavior has nose-dived to such an extent, courts have traditionally held that it is not necessary to demonstrate majority status before a bargaining order can be imposed. *See, e.g., Gissel*, 395 U.S. at 613, 89 S.Ct. at 1939; *NLRB v. Atlas Microfilming, Etc.*, 753 F.2d 313, 316 (3d Cir.1985); *NLRB v. Windsor Industries, Inc.*, 730 F.2d at 864; *NLRB v. Valley Plaza, Inc.*, 715 F.2d at 241–42. *But see Gourmet Foods, Inc.*, 270 NLRB 113, 116 (1984) (where the General Counsel failed to demonstrate a union's majority status, no bargaining order could issue, even though the employer had engaged in extensive unfair labor practices).

The second *Gissel*-approved use of a bargaining order extends to "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency

---

**4.** Section 8(a)(5) of the Act provides in substance that it shall be an unfair labor practice for an employer to refuse to bargain collectively with the bargaining representative of its employees. 29 U.S.C. § 158(a)(5).

to undermine majority strength and impede the election processes." *Gissel*, 395 U.S. at 614, 89 S.Ct. at 1940. As the Court noted:

[I]f the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair re-run) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue.

*Id.* at 614–15, 89 S.Ct. at 1940–41.

The Board found that Horizon's conduct in the instant case, whether or not encompassed by the first category of "exceptional" cases, unquestionably fit within the second integument of "less extraordinary" cases.[5] In such second category cases, however, the courts have routinely required a threshold finding that the union, at the relevant moment in time, possessed majority status within the bargaining unit. *See, e.g., Gissel*, 395 U.S. at 614, 89 S.Ct. at 1940; *Atlas Microfilming, Etc.*, 753 F.2d at 316; *Valley Plaza, Inc.*, 715 F.2d at 242; *NLRB v. Century Moving & Storage, Inc.*, 683 F.2d 1087, 1093 (7th Cir.1982).

Horizon's objections to this portion of the Board's order are basically twofold. First, Horizon argues that the authorization cards obtained by Heinz and Solomon for the Union were not a valid indicator of its majority status. Second, Horizon claims that the Board has not articulated specific examples and precise reasoning sufficient to support the issuance of a bargaining order in accordance with this court's precedent.

### A.

The Board found that the Union represented a majority of the employees in the appropriate bargaining unit, and that the employer's refusal to recognize and bargain with the Union was itself an unfair labor practice which transgressed § 8(a)(5) of the Act. Horizon's objections to the validity of several authorization cards, and therefore to the Union's presumed majority status, were each and all rejected by the Board in accordance with its *Cumberland Shoe* doctrine.[6] The *Cumberland Shoe* precept, approved by the Court in *Gissel*, 395 U.S. at 606–09, 89 S.Ct. at 1936–38, holds that a single-purpose authorization card will be counted towards establishing a union majority unless it is proven that the employee was led to believe that his/her card would be used solely for the purpose of obtaining an election. *Id.* at 608 n. 27, 89 S.Ct. at 1937 n. 27. *See also NLRB v. Magnesium Casting Co.*, 668 F.2d 13, 20 (1st Cir.1981).

In the instant case, the authorization cards were, as Horizon has conceded, unambiguously worded. They empowered the union "to act as [the signatory's] collective bargaining agent with the company for wages, hours, and working conditions." The Board found that, although the workers were told when approached that the cards would be used to obtain an election, the card solicitors neither informed them that the cards would be utilized exclusively for that purpose nor employed any other logodaedalus designed to urge the signers to disregard the single-purpose language which so plainly graced the authorization cards. This finding, bottomed as it is upon constitutive evidence in the record, is adequate. *See Gissel*, 395 U.S. at 606–07, 89 S.Ct. at 1936–37; *Magnesium Casting Co.*, 668 F.2d at 20. The

---

5. Though we need not, for reasons limned below, consider whether Horizon's peccadilloes were sufficiently extreme to place this case into the first *Gissel* rubric, we note that the employer here manifested a Stalingrad defense of sorts to the threat of unionization, fighting the Union, by any means at hand, from rock to rock and from tree to tree. The damage so created may well have been irreparable. *See* text *post* at Part III(B). Thus, were the issue squarely before us, we might well be sorely pressed to exclude such

hard core resistance from even the higher "exceptional" case trier of the *Gissel* paradigm.

6. *Cumberland Shoe Corp.*, 144 NLRB 1268 (1963), *enf'd*, 351 F.2d 917 (6th Cir.1965). *See also Levi Strauss & Co.*, 172 NLRB 732 (1968), *enf'd sub nom. Southwest Regional Jt. Bd. Amalg. Clothing Workers v. NLRB*, 441 F.2d 1027, 1034 (D.C.Cir.1970).

ALJ found, and the Board concurred by adoption, that the employees whose cards are in question had read and understood the cards before signing them. The mere fact that each may have been under the impression that the cards would be used to secure an election, without more, does not undermine their validity. *See id.* Furthermore, as employees are quite likely to repudiate such cards where, as here, nasty anti-union reprisals have previously taken place or have been threatened, the Supreme Court has flatly rejected the propriety of any probe into a worker's subjective motivations in signing an authorization card. *Gissel,* 395 U.S. at 608, 89 S.Ct. at 1937. *See also Magnesium Casting Co.,* 668 F.2d at 20–21.

We agree with the Board that the contested executed authorization cards were properly counted as indicative of a unit majority for bargaining purposes. Thus, the Union had presumptive majority status within the bargaining unit sufficient to cross the threshold so as to allow consideration of the second classification ("less extraordinary" cases) within the *Gissel* taxonomy.

### B.

■ Horizon contends that the Board's findings do not meet the requirements for a bargaining order as set forth by this circuit in *American Spring Bed Mfg. Co.,* 670 F.2d at 1247, and therefore, that we should decline to enforce the command. Horizon's argument prescinds directly from *American Spring Bed,* wherein we observed that, as a precondition to a bargaining order.

> [W]e, like other circuits, have insisted that the Board articulate specific examples and precise reasons for concluding that: (1) the employer's unfair labor practices so undermined the Union's majority that conducting a fair election would be unlikely; (2) the employer's unlawful conduct was likely to continue; and (3) the ordinary remedies of back pay, reinstatement, and posting of no-

> tices would be inadequate to ensure a fair election.

670 F.2d at 1247 (citations omitted).

In *American Spring Bed,* faced with "inadequate findings" on the Board's part, *id.* at 1248, and with the necessity of reversing the Board "on two issues that loomed large in its finding of a § 8(a)(5) violation and the decision to issue a bargaining order," *id.,* we ruled that a fair election was feasible. And, inasmuch as the privacy of the voting booth is indubitably the preferred method of determining union representation, *Gissel,* 395 U.S. at 602, 89 S.Ct. at 1934, we denied enforcement of the bargaining order. *American Spring Bed,* 670 F.2d at 1248–49.

*American Spring Bed* cannot, however, be read to hamstring the Board when a *Gissel*-type anodyne is appropriate, nor to establish a test to be mechanistically applied in every case in which the Board has imposed a bargaining order. To interpret *American Spring Bed* as requiring the Board to find, before a bargaining order can be enforced, that the employer's conduct was actually continuing and that it was inconceivable for a fair election to be ensured through the use of traditional remedies, would clearly contravene the rationale of *Gissel.* The *Gissel* Court sanctioned the use of a bargaining order not in cases where it would be impossible to hold a fair election, even through the use of conventional palliatives, but rather in those situations in which that possibility, "though present, is slight." *Gissel,* 395 U.S. at 614, 89 S.Ct. at 1940. Nor did the Court require that the Board find that the employer's unlawful conduct was likely to recur before a reviewing court could place its judicial imprimatur upon the bargaining order. To the contrary, the Court warned that "[i]f an employer has succeeded in undermining a union's strength and destroying the laboratory conditions necessary for a fair election, he may see no need to violate a cease-and-desist order by further unlawful activity." *Id.* at 612, 89 S.Ct. at 1939. The likelihood of the recurrence of unlawful activity on the part of the employer is a

factor which the Board may properly take into consideration when deciding whether or not to issue a bargaining order. *Id.* at 614, 89 S.Ct. at 1940. But, to establish that factor, read literally, as so integral to the Board's case that the imposition of a bargaining order fails without it, would virtually eviscerate the Board's discretion in this area.

Our decisions, carefully examined, support just such a view. Where there was no reasonable basis for a finding that interdicted conduct had irretrievably polluted the atmosphere or was likely to recur, *e.g.*, *American Spring Bed*, 670 F.2d at 1248, or where the record revealed only "borderline violations having minimal impact on the election process," *NLRB v. Amber Delivery Service, Inc.*, 651 F.2d 57, 70 (1st Cir.1981), we have consistently opted for the holding of an election. But, where the record exhibited the occurrence of serious coercive practices, reasonably likely to have severe and lasting effects, we have (even in the absence of direct proof of the probability of recurrence) unhesitatingly upheld a reasoned determination by the Board that the usual remedies will not suffice and that a bargaining order is the most salutary response. *E.g.*, *NLRB v. Hasbro Industries, Inc.*, 672 F.2d 978, 989–90 (1st Cir.1982).

The case at bar fits easily within the latter classification. As the Board has noted, Horizon's egregious breaches of protocol are precisely the type of "hallmark" violations which have been held, time and time again, to be surpassingly coercive.[7]

These transgressions permeate the record: they include threats of plant closure, star chamber interrogation tactics, dire imprecations, written admonitions, withholding of overtime, loss of employment, the grant of benefits to employees to undercut the Union's appeal, and the reassignment, demotion, and/or discharge of union adherents.[8] Such unwholesome strategems, severally and in concert, plainly undermined the fairness of the prospective electoral process. The well was poisoned.

The lingering effects of these actions upon the pristine atmosphere needed to hold an unsullied election are evident in the case of an employer like Horizon. At least half of the unit's twelve employees were subjected to threats, interrogations, and other illegal conduct. The size of the bargaining unit is a relevant consideration. *Ann Lee Sportswear, Inc. v. NLRB*, 543 F.2d 739, 744 (10th Cir.1976); *cf. Amber Delivery Service*, 651 F.2d at 70. In a unit as small as this one, where the individual engaged in the unlawful steamrollering is the owner of the business, the effect of such unfair labor practices is pervasive and ineluctably exercises a substantial impact upon the possibility of an untainted election. *See, e.g., NLRB v. Bighorn Beverage*, 614 F.2d 1238, 1243 (9th Cir.1980); *cf. NLRB v. Day Break Lodge Nursing and Convalescent Home*, 585 F.2d 79, 82 (3d Cir.1978). And, the malign effect is magnified by the fact that the employer's outbursts occurred within a compact time

7. The Board has often relied on the decision of the Second Circuit in *NLRB v. Jamaica Towing*, 632 F.2d 208, 212–214 (2d Cir.1980), to support the issuance of a bargaining order in this kind of situation, absent the existence of significant mitigating circumstances. The Second Circuit, however, has since labelled this aspect of the *Jamaica Towing* opinion as dictum stating "that hallmark violations alone do not support a bargaining order, and that not only mitigating circumstances but the lapse of time, employee turnover, and other significant factors must be examined." *NLRB v. Windsor Industries, Inc.*, 730 F.2d at 867. We have no need specifically to adopt either test here, as it is clear that even the application of the more rigorous *Windsor* standard to the facts of this case would nevertheless leave the bargaining order wholly supportable, given the parlous conduct of the employer and the relative absence of mitigation.

8. In *American Spring Bed*, 670 F.2d at 1247–48, we intimated that a bargaining order could not be issued *solely* as punishment for egregious unfair labor practices. We do not retreat from that position today. "The purpose of a bargaining order is not retribution, but to ensure a fair election." *Id.* at 1248. But, the nature and pervasiveness of the interdicted practices, taken ensemble with the likelihood of recurrence and the impuissance of other safeguards, must weigh meaningfully in the balance in determining whether a bargaining order is mete.

frame coincident with the onset of organizational activities.

In the instant case, the coercive pressures of the company's tactics cannot be gainsaid. The record is plain that they took their toll. Several employees who had previously signed authorization cards stated, upon pointed questioning by the employer, that they would support Horizon in the event of an election. In *Hasbro Industries, Inc., supra,* we enforced a bargaining order after the union had lost an election in a unit of fifteen employees. The behavior of the employer in *Hasbro* was characterized by the granting of wage increases to unit employees, threats of departmental closure and reduced benefits, and the interrogation of a single worker concerning his union activities. 672 F.2d at 989–90. The unfair labor practices committed by Hasbro appear to be but a pale pastiche of those undertaken by Horizon. The chances that a fair election could be held under these not-so-friendly skies seems remote.

Nor can Horizon avoid its just desserts by its pleonastic harping on the fact that its conduct, to the extent blameworthy at all,[9] has undergone a transformation and has been impeccable since at least mid-June of 1983. First, given the lasting infection of the workplace, *see* text *ante*, probability of recurrence is supererogatory. Secondly, the Board's finding in this regard is soundly bottomed.

To be sure, there is no evidence of untoward occurrences from mid-June forward. But, there has been no occasion to reignite the engines of oppression. Horizon had accomplished its short-term objectives: Heinz and Solomon were among the missing, the remaining employees had been cowed, the Union was on the back burner, and all was serene in Ryan's world. There was no further dirty work to be done. That does not mean, however, that the Board's finding of likelihood of recurrence is unsupportable. Quite the opposite is true. Past is but prelude, and old habits die hard. The enduring effects of Hori-

zon's all-out blitzkrieg against the Union and its proponents continue to hover like a grey cloud over the shop. And, more to the point, the Board was entitled to take into account the particularly vitriolic reception which the May, 1983 organizational effort had received. Horizon's principal had vowed surgically to excise the perceived "cancer" of unionization, and seemed perfectly willing to use a meat axe rather than a scalpel. Nothing in the record suggests that either Ryan's zeal or his cleaver have been blunted by intervening events or by the passage of time.

In industry, as elsewhere, history repeats itself. From aught that appears in the record, Ryan continues to control Horizon's destiny and Turilli remains as second in command. Protestations of repentance and reform which emerge out of the wild blue yonder, unaccompanied by the slightest indicia of trustworthiness, deserve to be greeted with considerable skepticism. Direct evidence will rarely be available to support a finding of likelihood of recurrence: the most benighted employer would be loathe, during the currency of Board proceedings, to proclaim defiance of an as-yet-hypothetical certification election. It would be unrealistic to require the presence of fresh blood on the axe as a precondition to a bargaining order. And, once it is recognized that indirect evidence will suffice, the circumstances at bar constitute a more than ample basis for a sound inference of future interference and/or enduring aftereffects. We will not, on this record, disturb the Board's reliance on that illation.

We respect the Board's special competence and expertise in fashioning remedies. *Shepard v. NLRB,* 459 U.S. 344, 349, 103 S.Ct. 665, 668, 74 L.Ed.2d 523 (1983); *Gissel,* 395 U.S. at 612 n. 32, 89 S.Ct. at 1939 n. 32; *Amber Delivery Service,* 651 F.2d at 70; *Matouk Indus., Inc.,* 582 F.2d at 128. And, where the Board's design is planned out with due regard to supportable findings, sensible reasoning, and an accurate

---

9. Horizon, even at this bitter end point, steadfastly maintains its innocence on all counts.

view of the governing law, there is no room for judicial intervention. The bargaining order must stand.

## IV.

The Board (*see* n. 1 *ante*) has in the instant case documented its findings as to the employer's illegal actions. It has set forth in sufficient detail the basis for the presumption of the Union's majority status and the reasons why the respondent's inauspicious conduct would be "likely to destroy the union's majority and seriously impede the election." *Gissel*, 395 U.S. at 600, 89 S.Ct. at 1933. *See also American Spring Bed*, 670 F.2d at 1247. The Board has concluded that Horizon's ill-advised practices are likely to continue and that garden-variety antidotes are not calculated, by themselves, to bring about a cure. We think that these findings are entirely supported on the record and that they justified the issuance of, inter alia, a bargaining order. We have considered each and all of Horizon's contentions (including some so frivolous as not to warrant discussion herein), and find them to be uniformly meritless.

The Board's order is, for these reasons,

*Enforced.*