86 F.3d 1146
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
T & J CONTAINER SYSTEMS INC., d/b/a T & J Trucking Company,
Respondent.
 No. 95-1661.
 United States Court of Appeals, First Circuit.
 March 4, 1996.
 
 On Application for Enforcement of an Order of the National Labor Relations Board.
 Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Frederick C. havard, Supervisory Attorney, National Labor Relations Board on brief for petitioner.
 Thomas J. McAndrew, Lauren E. Jones, Robert S. Thurston and Jones Associates on brief for respondent.
 NLRB
 ORDER ENFORCED.
 Before BOUDIN, Circuit Judge, and COFFIN and ROSENN,* Senior Circuit Judges.
 ROSENN, Circuit Judge.
 
 
 1
 Before the court is an Application for Enforcement of an Order of the National Labor Relations Board ("NLRB" or "Board"). The Rhode Island Laborers' District Council and its affiliated Local 1322, Laborers' International Union of North America, AFL-CIO (collectively the "Union") filed unfair labor practice charges against T & J Container Systems ("T & J" or "the Company") with the NLRB, alleging that T & J violated Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. §§ 158(a)(1) and (3). An administrative law judge ("ALJ") found that T & J committed unfair labor practices by opposing, through intimidation, T & J's employees' efforts to unionize, and by discharging an employee in retaliation for his union activity. The ALJ's order recommended that T & J cease and desist all unfair labor practices, reinstate the employee with back pay, and post appropriate notices. In addition, the ALJ recommended that a bargaining order issue, mandating that T & J, upon request, bargain in good faith with the Union as the exclusive bargaining agent of its employees.
 
 
 2
 A three member panel of the Board adopted the ALJ's recommended Order and directed that T & J take the action set forth in the Order. The Board petitioned this court for the full enforcement of the Order. See 29 U.S.C. § 160(e). The Board properly exercised jurisdiction pursuant to Section 10(a) of the NLRA, 29 U.S.C. §§ 151 & 160(a). This court has jurisdiction pursuant to Section 10(e) of the Act, 29 U.S.C. § 160(e). We enforce the Board's order.
 
 I.
 
 3
 T & J Container Systems, located in Johnston, Rhode Island, is in the business of collection and disposal of commercial trash. It employs in the aggregate approximately twenty truck drivers, equipment operators and mechanics.
 
 
 4
 Robert K. Dorgan, employed by T & J as a truck driver, approached the Union in early August 1992 to obtain information on how to organize T & J's employees.[1] Union officials gave Dorgan authorization cards for T & J's employees to sign. Several employees attended the first of three meetings to discuss unionization on August 11, 1992. By September 4, 11 out of 20 members of the bargaining unit had signed authorization cards.[2]
 
 
 5
 The Union claims that T & J interfered with the employees' attempts to organize. It alleges that T & J, through its president and co-owner, Antonio Pedroso, intimidated several employees by interrogating them about union activity at the company. The Union further alleges that T & J fired Dorgan in retaliation for his attempts to unionize the company. T & J replies that it discharged Dorgan for his reckless driving behavior.
 
 
 6
 a. Pedroso's alleged intimidation of employees
 
 
 7
 Joseph Cruso worked as a welder at T & J from November 1991 until his termination in October 1992.[3] Cruso testified that, prior to his termination, Pedroso approached him with questions about union activity at T & J. Pedroso allegedly asked Cruso if he wanted to be a "team player" and informed him that he would "take care of [him] later in time when this union thing was all over." Cruso further testified that Pedroso asked him the names of all employees that attended union meetings, and that Pedroso wrote down all the names. Pedroso testified that Cruso volunteered the union information to him. He denied writing down the names of the union activists.
 
 
 8
 Eric Kelling, a mechanic at T & J, testified that Pedroso approached him with inquiries about union activity. Kelling claimed that Pedroso told him that unionization would kill his business and "then nobody would have a job." Pedroso asserted that Kelling approached him with union information. He denied questioning Kelling about the unionization attempts.
 
 
 9
 Finally, William Melvin, a truck driver with T & J, testified that Pedroso questioned him about union organizational activity at the company. Specifically, Melvin stated that Pedroso asked him if Dorgan was present at the union meetings. Pedroso denied asking Melvin about Dorgan's presence at the meetings.
 
 
 10
 b. Dorgan's termination
 
 
 11
 Dorgan, Sr., the general manager of T & J, had charge of the hiring and dismissal activity at the company. He hired his son, Dorgan, to work as a general laborer at T & J in March 1991. One month later, the company moved Dorgan to the position of driver. The record shows that Dorgan was involved in several traffic accidents during his tenure at T & J. The first accident occurred in February 1992, and resulted in fatal injuries to the driver of the other vehicle. Dorgan testified, and T & J did not contest, that the company did not discipline him for the incident.
 
 
 12
 In April 1992, Dorgan was involved in another accident caused by his failure to comply with a yield sign. He claimed that the sign was obscured by trees. The police cited Dorgan for this accident, and the case is currently pending. Dorgan testified that T & J did not discipline him for the incident.
 
 
 13
 Pedroso testified that, because of adverse conditions affecting T & J, he had taken a renewed interest in his company in the summer of 1992. He began to construct an office over one of the garages on the premises, and vowed to hold a tighter rein on his employees. Pedroso testified that Dorgan's reckless driving had been an issue at T & J for some time prior to his termination. Pedroso averred that in July 1992, his father-in-law, Mr. Sylvestry, noticed one of T & J's trucks driving erratically. Sylvestry allegedly informed John DiRaffael, Pedroso's partner, of the incident. Upon discovering that it was Dorgan at the wheel, DiRaffael allegedly informed Dorgan, Sr. that he would have to fire his son.[4] Dorgan, Sr. testified that he carried out the order and fired his son in July 1992.
 
 
 14
 Pedroso testified that he had second thoughts about firing Dorgan due to the emotional impact the dismissal had on Dorgan, Sr. Thus, he stated that he requested Dorgan, Sr. to inform Dorgan to come in and speak to him. Pedroso testified that he told Dorgan that he could have his job back out of Pedroso's respect for Dorgan's father. He further testified that he requested that Dorgan alter his "Tomahawk haircut" before returning to work. Pedroso stated that he informed Dorgan:
 
 
 15
 [F]rom now on you have to watch your speeding, watch the way you drive, be more careful, because this is going to be your last chance. After this, if you mess up again, that's going to be it. You're not going to work here any more.
 
 
 16
 According to Pedroso, Dorgan returned to work that Monday, with a haircut, and the understanding that he was on "final notice." Thus, Pedroso alleged that Dorgan was aware that if he drove recklessly again he would lose his job.
 
 
 17
 Dorgan did not contest that he was involved in several accidents while employed at T & J. He testified, however, that no one at T & J ever disciplined him regarding his driving. He denied that his father fired him in July 1992 after a reckless driving incident. Further, Dorgan denied that Pedroso informed him his job was in jeopardy:
 
 
 18
 Q. Is it not true that Mr. Pedroso called you in and said, that he was going to give you one last chance to retain your employment with the company?
 
 
 19
 A. I do not recall him saying anything about any last chance to retain employment.
 
 
 20
 * * *
 
 
 21
 Mr. Pedroso just mentioned to me about a phone call that someone had received that I apparently cut someone off.
 
 
 22
 Judge Itkin: Did he say anything else to you?
 
 
 23
 * * *
 
 
 24
 A. He said he did not like the way my hair looked and if I did not cut it I would no longer work there.
 
 
 25
 According to T & J, the incident that triggered Dorgan's termination occurred on August 28, 1992. Pedroso allegedly received a call from his sales manager, Ted Scanlan. Scanlan claimed that he observed Truck # 31, driven by Dorgan, travelling recklessly at a speed of about 70 mph. He allegedly called the office to determine which employee was assigned to truck # 31, and upon discovering it was Dorgan, informed Pedroso of the incident. Pedroso fired Dorgan that afternoon.
 
 
 26
 Dorgan admitted that he was driving Truck # 31 on August 28th. He denied, however, that he was driving recklessly. He testified that the speedometer on the truck was not working at that time, and that the truck was incapable of going over 45 mph. The parties have subsequently stipulated that truck # 31's maximum speed is 54 mph. The parties also agree that the area where Scanlan spotted Dorgan was marked as a 55 mph zone.
 
 
 27
 Dorgan testified that Pedroso called him into his office and fired him that afternoon. He denied, however, that Pedroso mentioned Dorgan's driving ability. He testified:
 
 
 28
 A. He asked me if I knew anything about union activity in the shop. I said I didn't know anything. He said he had an idea that I was running it. I still said I didn't know anything about it. Then he alluded to the idea that I had a bad attitude toward his general manager, being my father. I asked him what he meant by that. He didn't give me an answer to what he meant by that at all. He told me he was going to terminate me for my misconduct, my attitude toward his general manager and, with that, he told me to punch out and leave.
 
 
 29
 Q. Did he tell you what your misconduct was?
 
 
 30
 A. No, he didn't.
 
 
 31
 At the close of testimony, the ALJ credited the testimony of Dorgan and all the witnesses for the Union. The ALJ did not credit the testimony of Pedroso and the other witnesses for T & J insofar as their testimony conflicted with the testimony of the Union's witnesses. Thus, the ALJ found that the employer committed unfair labor practices by interrogating employees about their union activity, and by firing Dorgan.
 
 II.
 
 32
 T & J filed exceptions to the ALJ's decision. The NLRB considered the decision and the exceptions to it. After careful review of the record, the Board rejected the exceptions and adopted the ALJ's findings and remedy for the reasons stated in his decision. The NLRB found that T & J violated Section 8(a)(1) of the NLRA through its interrogation of employees regarding their union activity; threatening employees with closure of its business; and promising benefits to employees for not supporting the Union. As a remedy, the Board ordered T & J to cease and desist from the above behavior, and from interfering with, restraining, or coercing employees in the exercise of their rights under the NLRA.
 
 
 33
 T & J acknowledges that the Board's finding of unfair labor practices with respect to certain employees, with the exception of Dorgan, is supported by substantial evidence on the record. Thus, it focuses its defense on the enforcement of the Board's order on Dorgan's termination. T & J denies that it discharged Dorgan in violation of his rights under the NLRA, and vigorously objects to the Board's issuance of a bargaining order. The Board asserts that it is entitled to enforcement of the uncontested portions of its remedial order. T & J does not contest this assertion.
 
 
 34
 Because T & J acknowledges that the record supports a finding of a Section 8(a)(1) violation, the Board is entitled to summary enforcement of the portions of its order addressing these violations. Thus, we enforce the Board's order insofar as it mandates that T & J cease and desist from threatening employees with discharge and closure of its business if the employees select the Union as their bargaining representative, and from interfering with, restraining, or coercing employees in the exercise of their rights under the NLRA.
 
 III.
 
 35
 The Board's finding that T & J violated Section 8(A)(3) of the NLRA by discharging Dorgan must be supported by substantial evidence in the record as a whole. See Universal Camera v. NLRB, 340 U.S. 474 (1950).
 
 
 36
 The National Labor Relations Act provides employees with a right to self-organization and to bargain collectively through representatives of their own choosing. 29 U.S.C. § 157. Section 8(a)(3) of the Act provides, in pertinent part:
 
 
 37
 § 158. Unfair labor practices
 
 
 38
 (a) It shall be an unfair labor practice for an employer--
 
 
 39
 * * *
 
 
 40
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage, or discourage membership in any labor organization....
 
 
 41
 29 U.S.C. § 158(a)(3). The NLRB found that T & J violated Section 8(a)(3) by discharging employee Dorgan in retaliation for his efforts in unionizing the workplace.
 
 
 42
 An employer may not discharge an employee for his pro-union activities. 29 U.S.C. § 158(a)(3). An employer may, however, discipline a union activist in the same manner it would discipline any other employee. Recognizing this often fine distinction, the Supreme Court clarified the standard for reviewing allegations of retaliatory discharge. See NLRB v. Transportation Management Corp., 462 U.S. 393 (1982) (approving Wright Line, 251 NLRB 1083 (1980)). Under Transportation Management, the General Counsel must show that the employee's union activity was a motivating factor in the employer's termination decision. If the General Counsel meets this burden, an employer may avoid liability under the Act only if it demonstrates, by a preponderance of the evidence, that it would have discharged the employee notwithstanding the union activity. Id. at 397.
 
 
 43
 The testimony of Dorgan, Cruso, Kelling, and William Melvin, demonstrated that Pedroso, as president of T & J, learned of certain employees' attempts to unionize the workplace. Further, the record reflects Pedroso's interest in Dorgan's role in the organizational effort. These witnesses testified that Pedroso specifically questioned them regarding Dorgan's presence at meetings, and that Pedroso discovered that Dorgan was the union instigator. For example, Cruso testified:
 
 
 44
 [Pedroso said] I want to know who started the Union, and ... I named Robbie Dorgan as starting the Union ... and Tony [Pedroso] said there's a kid that I do a lot for and he's going to do this to me.
 
 
 45
 The ALJ and the NLRB found that the Union met its burden of demonstrating that union animus was a motivating factor in T & J's decision to fire Dorgan. Substantial evidence supports the Board's finding.
 
 
 46
 Although T & J concedes that Dorgan's testimony shows that union animus was a factor in its decision, it contends that it would have discharged Dorgan notwithstanding his role as a union activist. Pedroso testified that he had ordered Dorgan to drive carefully or lose his job. Pedroso claims that Dorgan violated this "last chance" status on August 28, 1992, by driving recklessly. Further Dorgan, Sr. stated that T & J ordered him to fire Dorgan in July 1992, prior to any union activity, because of his reckless driving. He further stated that, although Pedroso let Dorgan return to work, he believed T & J would fire his son again if the reckless behavior continued.
 
 
 47
 The ALJ found T & J's proffered reasons for discharging Dorgan to be pretextual. At the close of testimony, the ALJ stated:
 
 
 48
 The testimony of Tony Pedroso, Edward Scanlan and Robert J. Dorgan was at times incomplete, unclear, vague, evasive, shifting and contradictory. They did not impress me as trustworthy or reliable witnesses.... I find and conclude here that the Employer ... discharged Robert K. Dorgan because he was chiefly instrumental in obtaining Union assistance and initiating the organizational drive. As for the Employer's assertions to the effect that Dorgan was discharged because of his cited driving record, I do not credit and reject these belated and shifting claims as pretextual.... Dorgan was summarily discharged on August 28 because he had brought the Union to the Employer's facility.
 
 
 49
 The board adopted the ALJ's findings, stating:
 
 
 50
 Before the union drive began, the Respondent had tolerated Dorgan's driving habits, despite alleged complaints from Scanlan and others, and had taken no action against him based on his driving record.
 
 
 51
 Evidently, Dorgan was not a model truck driver. Notwithstanding his past record, however, the Board's finding that T & J fired Dorgan in violation of his rights under the NLRA is supported by substantial evidence.
 
 
 52
 T & J discharged Dorgan on August 28, 1992. Pedroso made no reference to any report of reckless driving at the time he discharged Dorgan. The record reflects Pedroso's awareness of Dorgan's prominent role in the unionization effort. The record also shows Pedroso's unmistakable hostility toward the union activities. As the Board observed, "Pedroso repeatedly interrogated [Dorgan] about his union involvement and responsibility for the instigation of the union campaign." In addition, Pedroso's and Scanlan's relation of the events of August 28th appear shifty and untrustworthy. Scanlan claims that Dorgan drove that day in Truck # 31 at about 70 mph. Yet, the parties now agree that the truck was incapable of exceeding 54 mph. Further, the posted speed limit was 55 mph. Thus, it was reasonable for the Board to find that Dorgan was properly driving within the posted highway speed limit.
 
 
 53
 In addition, the weight of the testimony does not support T & J's assertion that Dorgan was on a "last chance" status with the Company. Dorgan testified that he was not disciplined for his driving record at T & J. ("I do not recall [Pedroso] saying anything about any last chance to retain employment."). Further, he stated that Pedroso did not mention Dorgan's driving record at the time of Dorgan's August 28, 1992 discharge. Rather, according to Dorgan, Pedroso questioned him regarding his union activity and then fired him "for his misconduct."
 
 
 54
 Dorgan repeated his version of the events leading up to his discharge several times, both on direct and cross-examination. At one point on cross-examination, however, Dorgan appeared, after some badgering, to contradict his prior testimony, stating:
 
 
 55
 Q. Do you recall [Pedroso] telling you that if you engaged in that type of conduct, recklessness or speeding or anything like that in the future he was going to just terminate you?
 
 
 56
 A. Something to that effect, yes.
 
 
 57
 Thus, T & J asserts that Dorgan admitted he was on "final notice" status due to his recklessness.
 
 
 58
 It is uncertain whether that solitary, equivocal reply permits the conclusion that T & J draws from it. Notwithstanding Dorgan's reply, the weight of the evidence as a whole supports the Board's determination that T & J's proffered reason for discharging Dorgan on August 28, 1992 was pretextual.
 
 
 59
 Universal Camera alerts reviewing courts that the "Administrative Procedure Act and the Taft-Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past." 340 U.S. at 490. Credibility determinations, however, are normally best left to the ALJ, and thus the Board. See NLRB v. American Spring Bed Mfg., Co., 670 F.2d 1236, 1242 (1st Cir.1982).
 
 
 60
 So long as the ALJ's position represents a choice between two fairly conflicting views, it should be enforced even if this court would justifiably have made a different choice had the matter come before it de novo.
 
 
 61
 Given all the evidence, the Board reasonably concluded that T & J discharged Dorgan in violation of Section 8(a)(3) of the Act.
 
 IV.
 
 62
 Generally, the NLRB has discretion to impose its "special competence and expertise in fashioning remedies." NLRB v. Horizon Air Services, Inc., 761 F.2d 22, 32 (1st Cir.1985). We must determine, however, if the Board's issuance of a bargaining order is supported by substantial evidence. See NLRB v. Pilgrim Foods, Inc., 591 F.2d 110, 119 (1st Cir.1978).
 
 
 63
 Ordinarily, employees' desire for unionization is determined by secret ballot election, which is the preferred method to determine bargaining unit representation. See NLRB v. Gissel Packing Co., Inc., 395 U.S. 575, 595 (1969). If, however, the Board concludes that an employer's anti-union practices are so egregious that they prohibit the possibility of a fair election, the Board has the authority to issue a bargaining order. Id. Such an order mandates that the employer bargain with the union, even without a certification by the Board after a formal election.
 
 
 64
 The leading case discussing the propriety of the Board's issuance of a bargaining order is NLRB v. Gissel Packing Co., Inc., 395 U.S. 575. In Gissel, the Supreme Court asserted that the issuance of a bargaining order is appropriate in two circumstances: (1) upon a finding of "outrageous" and "pervasive" unfair labor practices, that render a fair and reliable election impossible; and (2) upon a lesser finding of employer misconduct where there is also a showing that at one point the union had a majority. Id. at 613. The Court further noted that minor or less extensive unfair labor practices, with a minimal impact on the "election machinery," will not sustain a bargaining order. Id. In the instant case, the ALJ and the Board found T & J's actions to fall within the second category. ("I find and conclude that a bargaining order is warranted here ... the union had obtained a clear majority status.").
 
 
 65
 In American Spring Bed, 670 F.2d at 1247, this court read Gissel narrowly. The court required the Board to show that the employer's unfair labor practices would continue, and that ordinary remedies such as back pay and reinstatement would not provide for a fair election. Id. at 1247. In NLRB v. Horizon Air Services Inc., 761 F.2d 22 (1st Cir.1982), however, the court asserted that such requirements would contravene the rationale of Gissel. It noted:
 
 
 66
 The Gissel court sanctioned the use of a bargaining order not in cases where it would be impossible to hold a fair election, even through the use of conventional palliatives, but rather in those situations in which that possibility, though present, is slight.
 
 
 67
 Id. at 30 (citations omitted). Thus, this court will uphold a bargaining order where an employer's unlawful practices will have lingering effects in the minds of the employees. Id.
 
 
 68
 In the instant case, the Board determined that a bargaining order was warranted under Gissel. It found that an election would not "reliably reflect genuine, uncoerced employee sentiment." The factors that the Board considered in making its decision included: (1) top management's "deeply committed" anti-union sentiment; (2) Pedroso's continuing and close presence as president and co-owner of T & J; (3) the quick reaction time of top management to the Union activity; (4) unlawful conduct including coercive interrogation, threats of discharge and plant closure, and promise of benefits for not supporting union; (5) the targeting of 20% of the small bargaining unit; and (6) the discharge of the union instigator. The foregoing conduct includes what has been termed "hallmark" violations that are highly coercive in nature. See NLRB v. Jamaica Towing, Inc., 632 F.2d 208, 212-213 (2d Cir.1980). These are threats of discharge and business closure, and promise of benefits for not supporting the Union. Further, in assessing the impact of the Company's unfair labor practices in this case, the Board emphasized that Pedroso, the President and Co-owner of the Company committed the misconduct. The Board further noted that Pedroso "orchestrated" the discharge of Dorgan. Pedroso was the consistent central force in uncovering and combatting the union organization effort. In a small unit, as we have here, this court's observation in Horizon Air Services, 761 F.2d at 31 bears repeating:
 
 
 69
 [W]here the individual engaged in the unlawful steamrollering is the owner of the business, the effect of such unfair labor practices is pervasive and ineluctably exercises a substantial impact upon the possibility of an untainted election.
 
 
 70
 Id. at 31. Thus, the Board in the instant case found that T & J's "employees' desire for union representation, as reflected by their signed authorization cards, would, on balance, be better protected by a bargaining order than by traditional remedies."
 
 
 71
 This court has noted that the issuance of a bargaining order is an "extreme remedy." See NLRB v. Pilgrim Foods, Inc., 591 F.2d 110 (1978). If, however, the Board's decision is made "with due regard to supportable findings, sensible reasoning, and an accurate view of the governing law, there is no room for judicial intervention." Horizon Air, 761 F.2d at 32. See also NLRB v. Amber Delivery Service, Inc., 651 F.2d 57, 70 (1st Cir.1981) ("deference normally accorded to the Board's expertise in fashioning remedies").
 
 
 72
 We perceive no abuse of discretion by the Board in issuing a bargaining order in this case. An examination of the record reveals that the Board's findings are well supported and, although an election is the much more preferred procedure in the determination of a bargaining agent, a bargaining order is warranted here. The Board did not unreasonably conclude that T & J's activities and conduct would preclude the possibility of a fair election.
 
 V.
 
 73
 We believe that there is substantial evidence in the record to support the Board's finding that T & J violated Section 8(a)(1) of the NLRA. Further, the record supports the Board's finding that T & J discharged Dorgan in retaliation for his union activities in violation of Section 8(3) of the Act. Thus, the Board's order that T & J cease and desist from this unlawful behavior, reinstate Dorgan, and post notices is appropriate. Further, we hold that the Board acted within its discretion in issuing the bargaining order.
 
 
 74
 The Board's order will be fully enforced.
 
 
 
 *
 Of the Third Circuit, sitting by designation
 
 
 [1]
 Dorgan's father, Robert J. Dorgan, is T & J's general manager. This opinion will refer to the father as Dorgan, Sr., and to his son, Robert K. Dorgan, as Dorgan
 
 
 [2]
 At the hearing before the ALJ, the parties presented differing views of the make-up of the bargaining unit. In this enforcement suit, however, T & J does not contest the ALJ's or Board's finding that the Union secured cards signed by a majority of the relevant employees
 
 
 [3]
 T & J's new garage manager, Robert Bessell, fired Cruso after an alleged disagreement. Cruso filed unfair labor practice charges, but they were dismissed
 
 
 [4]
 Pedroso gave this account of the July events. Neither Sylvestry nor DiRaffael testified at the hearing